In Re Proceedings Against GILBERT R. TITUS, No. 40492—225 S. W. (2d) 715.

Court en Banc, December 12, 1949.

Rehearing Denied, January 9, 1950.

*Wm. G. Boatright* and *Curtis J. Quimby* for informants.

*Clay C. Rogers* for accused-respondent.

ELLISON, J.—This is a proceeding for the disbarment of the respondent Gilbert R. Titus, a licensed attorney at law, residing at Independence, Jackson County, for alleged unprofessional conduct. The information was filed here by the Advisory Committee established by our Rule 5.14, by leave of this court under Rule 5.03, after that Committee had first made a preliminary investigation at which the respondent was present with his counsel, and permitted to cross-examine and to present witnesses. Thereafter this court appointed as Special Commissioner Sam T. Evans, Esquire, of the Daviess County bar, to take evidence at hearings upon the issues raised by the information, and he has filed his report.

The information contains nine counts. Count 1 charges the respondent altered, without the signers' knowledge, written statements taken from four prospective witnesses in contemplated personal injury

litigation in which the law firm of Sprinkle & Knowles, with which he is associated, represented the plaintiff. These witnesses later testified in the case for the defendant, and the alleged altered statements were introduced and used by respondent's associate counsel in cross-examination. The changes assertedly were made by leaving a blank space at the bottom of the *text* of each statement, between it and the verification and signature below, and thereafter inserting foreign matter in that space. The Special Commissioner found for respondent on all of these four charges.

Counts 2 to 9 charge respondent with soliciting several persons to make claim and file suit for personal injuries against railroad companies, a public transportation company, and a motor vehicle owner, and in one case for the solicitee's loss of the services of his wife. The Special Commissioner sustained the charges against respondent in Counts 4, 5 and 9, and found in his favor on Counts 2, 3, 6, 7 and 8. He recommended that respondent be suspended from the practice of law for eight months.

The basic issues are factual. The good reputation of respondent for honesty, veracity and integrity was attested to by nine reputable persons and is not challenged in this proceeding. The record is voluminous and involves twelve separate fact controversies. The testimony taken before the Advisory Committee covers 593 pages; that before the Special Commissioner 1320 pages; and the statements and briefs of adversary counsel 378 pages. To avoid undue extension of the opinion we review only the charges on which the Special Commissioner found against respondent—save as to the first count, and the sixth, seventh and eighth counts.

The four witnesses whose written statements are charged by the first count to have been altered, were: Victor Paul; Stanley Smith [10 years old at the time]; and Mr. and Mrs. Charles House. These statements were taken in preparation for the trial of a wrongful death case, Cline v. Tobin Construction Co., wherein a young woman motorist was killed on a night in May or June, 1940, at or near a highway viaduct in course of construction over railroad tracks and a creek near Greenwood in Jackson County. The construction work obstructed the highway, called the "old road", necessitating a meandering detour therearound. Apparently the automobile failed to take the detour, and followed the highway, the casualty resulting. The firm of Sprinkle & Knowles of Kansas City, with which respondent was associated, brought a suit against the contractor for her death, and one of the important questions in the case was whether the detour was marked with detour signs and lights that night.

The written statements of the four witnesses were taken over a period of a few days, weeks or months before the trial of the Cline case, by respondent Titus or associate counsel. They were written by the taker with a fountain pen on sheets of yellow paper about 13

inches long and 8-½ inches wide, ruled with printed blue lines about ⅓ inch apart. All began on the first or second blue line from the top of the sheet. They were prepared, and were signed by the witness, on the spot where and when he or she was interviewed.

The Special Commissioner found that the written statement of Victor Paul was not taken and written by respondent ·Titus, as charged, but by his associate counsel Mr. Knowles; and that respondent was not even present on the occasion. We concur in that finding. Knowles and Titus both so testified, as did also Harvey Willsey, a former Justice of the Peace at Independence, who said he was present with Knowles at the time. Furthermore, the Paul statement is in an obviously different handwriting from that of the other three statements. So that issue drops out of the case.

 Turning next to the statement of the 10 year old witness Stanley Smith, the textual part of which occupied 26 lines on the sheet. So far as material here it recited he had helped a neighbor boy set out the lanterns along the detour the night of the casualty. "We" had to go back and relight one of them. "There was one light on a sand pile and one on the north side of the road, about 30 or 35 feet apart." After the casualty he returned to the scene thereof. The foregoing and other recitals immaterial·here 'filled 21 lines of the 26 line written statement. The closing five lines [immediately preceding the line reading "Have you read this statement" and the signature] occupied 1.20 inches of vertical space, and continued: *"I did not see any lanterns that had been run over and I know that there were only two lanterns at the old road the night of the accident. I paid no attention to the detour signs that night."*

·· The 13 line written statement of Charles House stated he had made several trips through the detour road and had seen lights that had gone out, which he stopped and lighted. He had done this at the old road. He went through the detour the night of the casualty but "paid no attention to the lights." The statement then closed with two sentences occupying a vertical space of .75 inch next above the verification and signature: *"I saw no detour sign on the north. Afterwards flares were on each side of the road."*

The 26 line written statement of Mrs. Charles House recited she and her husband drove through the detour on a round trip to·Kansas City the night of the casualty, returning about 11 p.m. They did not know of it until the next morning. It was dark when they drove through the detour. "There were *no* lights in the old road." After further recitals describing the course of the meandering detour, the statement closed with five lines as follows above the verification and signature, occupying a vertical space of 1.20 inches in the written statement: *"There were no lighted lanterns in the old roadway when we went through after dark as we were going to Kansas City. I do not recall any detour sign at the old road."*·

It will be observed that detour *signs* are not mentioned in the text of any of the three statements except the closing challenged parts; and that there they are mentioned negatively, the prospective witness stating that he: "paid no attention to"; or "saw (on the north) no"; or did "not recall" any detour signs. The *text* of Mrs. House's statement further said there were "*no* lights in the old road."

But at the trial of the Cline case Stanley Smith and Mr. and Mrs. House all swore there were four lighted lanterns at the locus in quo on the night of and before the casualty, two hanging on detour *signs* respectively on the north and south sides of the old road, and two on the ground in the road. There was also a detour *sign* on a branch road leading from the detour road .to the defendant's construction office. There were three lanterns there, one hung on a detour *sign*.

On cross-examination Stanley Smith said his written statement was shown to him in the witness room before he went on the stand, the other two witnesses here involved being present. He denied that "we" (including himself) had gone back and relighted one lantern, saying the watchman and another boy did that. He also testified he saw two smashed lanterns in the road after the casualty, thereby contradicting the first clause of the challenged part of his written statement. In answer to a question "Did you write the last line before your signature" [this being the "Have you read this statement?" line] he said he did, but on redirect examination said he just signed his name. He admitted his mother and he both read the statement and she read it to him before he signed; and conceded he did not complain of it then. He was in the U. S. Army in Germany when the hearings were held by the Advisory Committee and the Special Commissioner. But respondent took two written statements from Stanley's mother who had been present when the boy gave his statement and she read it to him.

Her first one was short and the pertinent part said she went to the scene of the casualty, but didn't pay any attention to the lights or know whether the lanterns were burning; and that she saw no smashed lanterns, or barricades or detour signs at the old road. The second statement, taken after she had moved to Kansas City, was longer. It recounted the taking of Stanley's statement by respondent and her reading it to him. She said Stanley told respondent he didn't recall anything about the detour signs that night. And she stated no blank space was left above Stanley's signature; that she had reread the statement that day and it appeared exactly as when Stanley signed it. Mrs. Smith testified briefly at the Advisory Committee hearing, and at greater length before the Special Commissioner, where she was vigorously cross-examined as to her memory of events six years past.

Returning to the witness Charles House. On cross-examination at .the Cline trial the witness said he• remembered distinctly that the warning lanterns were· lit the night of the casualty; that he signed

his written statement as directed; and that there then was a blank space of three or four lines between the bottom of the text [which he marked with an X] and his signature. He said the recital in this written statement that he paid no attention to the lights that night referred only to *particular* lights. About five years later, after the General Chairman of Bar Committees had become active in the matter, this witness gave another short written statement to respondent Titus, in which he said that due to the lapse of time he could not remember the contents of his original written statement given Titus before the Cline trial, and could not say whether it had been changed or added to. Still later House was examined at length before the Advisory Committee in 1946 and before the Special Commissioner in 1947. In both these hearings he said he had forgotten the facts. But he did say in the Advisory Committee hearing that there were detour signs and flares along the road on the night of the casualty, though he wouldn't attempt to specify where they were located.

Mrs. House testified on direct examination at the Cline trial that a few days prior thereto respondent Titus interviewed her and wrote her statement. He asked her to "add" (sign?) it about four lines below the "Have you read this statement?" line, and in testifying she marked an X there. On an aggressive cross-examination she said there was a space of three or four lines between the text of the statement and where she signed it. She further said she hadn't talked to the lawyers about that space. Presently cross-examining counsel asked (italics ours): "Q. You wrote it, then, three or four lines from where it said you have read this statement there, and that is where you say it stopped." "A. Yes, sir." "Q. And this was written, 'Have you read this statement', *you wrote that yourself?*" "A. Yes." "Q. And wrote your name?" "A. Yes, sir." Thus the witness seemingly was lead into saying that *she* wrote the "Have you read this statement?" line. But obviously she was misled or confused; for the questions were directed to where she signed her *name* and wrote the word "Yes". Respondent himself conceded he wrote the quoted line, and the handwriting so shows.

At the hearing before the Advisory Committee Mrs. House testified that after respondent Titus was under investigation [some five years after the Cline trial] he asked her to give him a second, retractive written statement declaring her original written statement was "written wrong", and that she couldn't remember what was in it. She refused, although her husband had given such a statement. She also testified her original statement contained matter which was not in it when she signed it, specifying a sentence in the *text* stating (italics ours) "There were *no* lights in the old road," and also one in the challenged part at the end, reciting: "There were *no* lighted lanterns in the old roadway when we went through after dark as we were going to Kansas City. I do not recall any detour sign at the old road."

This last sentence appeared to be in a fuller and finer lined handwriting. She declared both of those statements were untrue, and that she didn't make them, but she wavered some as to whether the "*no* lights" sentence was in the text when she signed the statement, though she denied the "no detour" sentence was in it. And she went on to say "I felt that I knew the statement had been changed."

At the hearing before the Special Commissioner Mrs. House was subjected to a 79 page direct and cross-examination. She testified there that *all* of the challenged part of her original statement following the X marked on it during the Cline trial was not in it when she signed it. On a long cross-examination she was pressed on the point that before the Advisory Committee she had declined to say the whole of her original statement following the X mark was not in it when she signed it, but only that the "no lights" and the "no detour" sentences were spurious, the other challenged parts being merely untrue. The cross-examination further stressed her statement at the Cline trial that *she* had "added" the line "Have you read this statement?", as explained in the second preceding paragraph.

Professor Ralph F. Turner, an expert examiner of questioned documents, testified as a witness for the defendant in the Cline trial, and for the informants in this proceeding before the Special Commissioner. In substance, his testimony was that where one ink line made with a split point pen intersects another ink line after it has had time to dry, the two ink lines do not "bleed" or merge into each other, and it can be ascertained microscopically which is the overlapping line; and the tracing of the two sharp nibs of the pen can be discovered. By that process the witness formed and expressed the expert opinion that in each of the three statements written by respondent Titus, a portion of the alleged spurious matter therein overlapped a portion of the last genuine line "Have you read this statement", and therefore must have been added later. In the Stanley Smith statement the tail of the *g* in the last word "night" overlapped the top of the second *t* in "statement". In the Charles House statement the *i* in "side" overlapped the top of the *h* in "this". And in Mrs. House's statement the tail of the *g* in "sign" overlapped the top of the *y* in "you".

In behalf of respondent, Mr. Charles C. Scott, an author and experienced member of the Kansas City bar, testified as an expert on the questioned statement. He expressed the opinion that it would be impossible to determine from the three statements which of the intersecting letter lines therein had been written last. In that connection he said that in the textual part of one of the statements, letters intersecting with those in the line *below* appeared to have been written *last*, and that from the character of the paper and ink no conclusion could be expressed with certainty.

Respondent Titus testified he had no financial interest in the Cline case, and that the Stanley Smith and Charles House statements were written by him in their entirety without change or alteration, the Stanley Smith statement being taken in the presence of the latter's mother. But with respect to the statement of Mrs. Charles House, respondent admitted the last sentence in the challenged portion thereof, stating "I do not recall any detour sign at the old road," was inserted by him *above* and *after* he had written the final words "Have you read this statement?". He said he handed the statement as first written to Mrs. House and she read it and handed it back to him "with some comment about something else," after which he added the sentence "I do not recall any detour signs at the old road," and handed the statement back to her, whereupon she again read it, wrote the word "Yes" and signed it. It will be remembered this added sentence was in fuller and finer lined handwriting. As to that respondent said he didn't know whether he wrote that last sentence with a different pen, but that he had two pens with him, and was under the impression that he did use the other one, having handed the first pen to Mrs. House when he submitted the statement to her the first time.

But if that be true, it seems strange that Mrs. House didn't sign her statement then, since she found no fault with it. Furthermore, this added sentence took a line and a half of space on the ruled page, thus showing on respondent's version, that much blank space had been left above the "Have you read this statement?" line before this insertion was made. Respondent's testimony on this point necessarily concedes the testimony of informant's expert Turner was correct when he said the added sentence was written last, and respondent could give no explanation for leaving the space open. In addition to that is the singular fact that nowhere except in these challenged parts did any of the three witnesses' statements contain any reference to *detour signs,* one of the important factors in the case. In view of the physical evidence, the positive testimony of Stanley Smith and Mr. and Mrs. House at the trial, and the respondent's unsatisfactory testimony, we must disagree with the conclusion of the learned Special Commissioner, and find that respondent did add the challenged parts to the ends of the three statements after they were signed.

 Turning now to the Special Commissioner's finding on counts 4, 5 and 9 of the information, respectively, convicting respondent Titus of soliciting Morris F. Hall, Mrs. Dale King and Clarence Trindle to make claim and file suit for personal injuries. First, as to the general facts. Respondent was admitted to the bar in 1938, and entered the office of Sprinkle & Knowles in Kansas City in 1940. He worked there on a monthly salary and one-half of the fees from any business he originated. At the time of the hearings his salary

was $225 per month. He testified he had brought to the office an average of fifteen personal injury suits each year. Prior to a week before the hearings he had never tried a lawsuit himself except divorce cases.

With reference to the fourth count, concerning the Hall suit. The minor son of Morris F. Hall was struck by a motor vehicle in Kansas City while crossing a street on the way to school on the morning of April 13, 1943. He was taken to the General Hospital. The father at that time was employed at the North American Bomber Plant in Kansas City, Kansas. He said he was notified of the casualty before noon, by someone's calling him from his home or the hospital. He went to the hospital direct, or by way of his home first. When he got to the hospital his wife had arrived there. He didn't remember whether respondent Titus came to see him that day or the next, but when he got back home it seemed to him Titus had been to the hospital. However he said he didn't go to the hospital with Titus on his first trip there. But he had the recollection that Titus brought him home from there.

At any rate he said Titus had seen his wife before talking to him and asked her about taking the case, but she said no, that he would have to see him (Hall). Whenever it was, Titus came to their home twice the same day he thought. Hall said he refused on the first interview to employ Titus, who was a stranger to him, but that his wife thought they ought to let Titus have the case. So they did on the second interview. Titus wrote a single copy contract of employment longhand and undated. It was unilateral, only the two parents signing it, and provided for a 50% contingent attorney fee on the recovery less expenses. This occurred in the afternoon or evening. The next morning witness Hall went back to the Bomber Plant and talked to the company attorney, Mr. Addison Shepperd, who advised him not to have anything to do with the Titus contract, and to consult another Kansas City lawyer, Mr. Robert Jackson. After that he never saw Titus any more.

Hall estimated he went to see Jackson three or four days later, but Jackson testified Shepperd telephoned him on April 14, the next day after the casualty, that Hall was coming to see him and Hall arrived at his office within a very short time. To be strictly accurate Jackson's testimony did not explicitly fix that date, but it was shown that Hall made affidavit in Jackson's office detailing the manner in which respondent Titus had obtained his employment contract, and that affidavit was dated April 14. After several days Jackson accepted employment and settled the case for $3500, paying Titus $100.

The affidavit was somewhat at variance with Hall's testimony at the trial as to when he first met Titus. It recited that when Hall was notified at the Bomber ▇ Plant of his son's injury he drove to his home, and about that time respondent Titus arrived out in front, an-

nounced he was a lawyer and sought employment in the damage suit. The affidavit further stated Titus was a stranger to him and was not sent for; that his wife was already at the hospital; that Titus drove him to the hospital, but on their arrival there Mrs. Hall had 'left; and Titus brought him back home where, after considerable conversation, Hall and his wife signed an employment contract with Titus and some firm in the Dierks Building.

On April 16, 1943, three days after the casualty, Mrs. Hall wrote a longhand letter to respondent' Titus on plain white paper "to advise you that we desire to terminate any relationship that you now state exists between us as attorney and clients. Please forward to us immediately the alleged contract of employment that you obtain(ed) from us on a recent date." The letter was signed by both Mr. and Mrs. Hall, her signature appearing first. Hall evidently had a poor memory for details. He was a carpenter by trade but after eight weeks schooling had worked as an inspector of airplane parts at the North American plant in Kansas City for 18 months. At the time of the trial some four years later he lived in southern Arkansas, and was summoned to the trial by letter and telephone. Hall's wife did not come—at least did not testify.

Respondent Titus testified that Hall came to his office in the Dierks Building during regular office hours in the latter part of the afternoon of April 13, the date of the casualty, and employed him in the tort action for the injuries to Hall's son. Hall told him he had been directed to him by Mr. Homer Swenson, a timekeeper at the North American plant. Swenson was also a licensed attorney but not practicing law. He and respondent Titus had been classmates in the Kansas City School of Law. Respondent testified he then and there prepared the employment contract and Hall signed it. Then both proceeded in their separate automobiles to Hall's residence, and Mrs. Hall signed it. He was a stranger to both parties. He said there were stenographers in the Sprinkle & Knowles law office but that it was sometimes difficult for him to get hold of one, and that it was a personal practice of his to draft all contracts in longhand, and also to leave them undated.

Mr. Homer L. Swenson, the non-practicing attorney and timekeeper at the North American plant, testified that during the lunch hour [which he said began at 11:42] on or about April 13 he came upon a group of employees, including Hall, who were talking about the injury to Hall's son, and what Hall ought to do. Swenson advised him to seek legal advise. Being asked by Hall whether he could handle the matter, Swenson said he could not, and referred Hall to respondent Titus, giving him the latter's office address.

On cross-examination, however, it developed that Swenson didn't know whether the foregoing conversation occurred on the day Hall's son was injured (April 13) or on the next day. For in the hearing

before the Advisory Committee Swenson had testified as to the time of the casualty: "I think it just occurred, it happened the day before; he didn't tell me." And he had further said "I read it in the paper, a squib in the Star—" a Kansas City *evening* paper. Then he added he might have, or did, read the Star *after* the interview. But finally, at the later hearing before the Special Commissioner Swenson admitted he didn't know whether the conversation he had detailed occurred the day the child was hurt or the next day.

The importance of this testimony was, that if Swenson had not learned of the casualty until the noon hour of the day it occurred, or the next day, he could hardly have directed Hall to respondent Titus' office in time for Hall to be there when Titus said he came —during office hours—and to complete the signing of the contract at Hall's home on the day the child was injured. Furthermore, as the Special Commissioner points out in his report, if the child was injured in the morning of April 13 on the way to school, and Hall was notified by telephone, it is unreasonable to believe he would have remained at the Bomber Plant until the noon hour. Considering all the testimony, and ▮▮▮ the weight thereof, we agree with the finding of the Special Commissioner that respondent Titus solicited the employment as alleged in the information.

▮▮ Next as to the charge in the fifth count of the information concerning the Mrs. Dale King suit. It alleged that on or about January 22, 1944, while the accused was Police Judge of Independence, he solicited employment by Mrs. King as her attorney to make claim and file suit for personal injuries sustained by her and her son, and dismissed a charge of careless driving pending against her in his Police Court. Respondent's defenses are: that he did not solicit the employment, but was retained by Mrs. King and her brother; and that there was no legally valid arrest and careless driving charge to be dismissed.

The underlying facts were that an automobile Mrs. King was driving collided with a Kansas City Public Service bus in Independence about 9:30 p. m. on or about January 24, 1944. Police arrested and summoned both drivers to appear in Police Court on charges of careless driving. Mrs. King and her child received some injuries. She telephoned her parents, Mr. and Mrs. Lewis, and they came to police headquarters. Her father signed a recognizance for her appearance in police court the next day. She went with her father and mother to see Dr. Allen that same night.

Mrs. King testified before the Special Commissioner in November, 1947, that she appeared in Police Court the following morning, went to an officer at a desk, and told him who she was. He directed her to be seated, saying Police Judge Titus would be there presently. She had never met him before. Shortly thereafter Titus came to her and introduced himself, saying he wanted to talk to her. He took

her out in the hall and said he wanted to handle her damage suit against the Public Service Company on a 50-50 basis. Before she left the building he had prepared and signed a single copy longhand contract of employment. Her brother, Roy Lewis, did not accompany her to police court but arrived before the contract was prepared. He was supposed to have taken her down there but was late, so she went alone in a taxi. He approved the making of the contract. She left without appearing in Police Court on the pending charge against her, and it was never prosecuted. Later, respondent Titus filed her suit against the Kansas City Public Service Company and settled it for $1600, he retaining $800.

She had previously testified before the Advisory Committee on August 1 and October 18, 1945. We find no transcript of the August 1 testimony in the record. But the one for October 18 is somewhat at variance with her foregoing testimony before the Special Commissioner. In that transcript she said her brother went *with* her to the City Hall the morning after the casualty; that he talked to Titus *first* and brought him over to her; and that the brother made the decision to employ Titus—she guessed because her father had talked to him about her damage suit, and they had concluded she should bring the suit and that "it would be a good idea to hire" Titus. Presently she was recalled and parts of the testimony of her brother Roy before the Advisory Committee were read to her, wherein he stated that on his arrival at the City Hall on the morning Titus was employed, she and Titus *already* were out in the hall. She answered that she couldn't remember whether that was correct. But she did say she didn't know Titus, and hadn't talked to him before her brother came. And she said she had sat there *waiting* five minutes before the brother arrived, and didn't remember of being in the hall with anyone.

Yet in spite of her testimony at the previous Advisory Committee hearing, as set out in the last paragraph, and notwithstanding she was closely cross-examined with respect thereto by respondent's counsel at the later hearing before the Special Commissioner—she nevertheless adhered pretty closely to her direct testimony at that hearing, as set out in the second preceding paragraph. And she spoke with some positiveness. Likewise, she declared no one had approached her father and mother about her testimony the second time she testified [at the Advisory Committee hearing on October 18, 1945], nor had her father, mother or brother ever done so.

■■ At the hearing before the Special Commissioner, the only other witness in chief for informants was Mr. Henry M. Griffith, attorney for the Kansas City Public Service Company. He testified that on the morning of January 26, 1944, two days after the casualty, he went to the Independence Police Court representing the Public Service Company's bus driver. Respondent Titus, Police Judge,

announced Mrs. King could not be present, and both cases were continued then and three times thereafter. Then respondent Titus talked about disqualifying himself and calling in a special judge, and both cases were finally dropped or dismissed.

Before the Special Commissioner, on the respondent's side Judge Titus testified that on the morning after the arrest he was standing in police headquarters when officer McMillen notified him a young lady outside wanted to talk to him. He went out into the hallway and found Mrs. King and her brother Roy there. *They* told him about the automobile collision and asked him to represent Mrs. King against the Public Service Company. He accepted the employment, wrote the contract, and notified the Company by letter. As to the continuance of the police court cases against both drivers, he said it was common practice in that class of cases. Officer McMillen, referred to above, said he was one of the arresting officers, but that he couldn't recall whether Mrs. King was arrested or not.

Mr. Ralph Stone, city attorney, testified that about an hour after the casualty Mrs. King's father, Mr. Lewis, telephoned him, asking what he "would think of Mr. Titus to handle the case," meaning a damage suit against the Public Service Company, and he replied that he thought Titus was all right and his firm was a good firm. Lewis then said he would see Titus, or have his daughter do so. But Mr. Stone said he didn't inform Titus about that conversation with Lewis until nearly two years later, after the disbarment proceeding was under way.

Mr. Lewis, Mrs. King's father, testified that in his foregoing telephone conversation with Stone he asked him if he would "take the case" for Mrs. King, he having been the family lawyer, but that Stone declined and recommended Titus, whom he (Lewis) *didn't know.* And since he had to work the next morning, he called his son Roy, and directed him to accompany Mrs. King to police court and ask Titus to handle her case against the Public Service Company. He thought Titus could take care of both that and the police court case. But he said further he didn't believe Mrs. King was *arrested.* Mrs. Lewis testified that she heard her husband's part of the telephone conversation with Stone, and also heard him telephone their son Roy to take Mrs. King to police court next day. Before the Advisory Committee Mrs. Lewis testified *she* had known Titus for 12 or 13 years; and that after she and Mr. Lewis had returned from the scene of the casualty he said more cases had been won against the Public Service Company, and they concluded Mrs. King could get damages.

In rebuttal before the Special Commissioner the informants called Mrs. King's brother Roy as a witness. At first he said he took her to police court in his own automobile. Being confronted with his testimony before the Advisory Committee, that he *was* to have gone

with her but she was already there when he got there—he said if he so testified it was true. Then he said it was true that when he arrived at police court Mrs. King and Titus already were talking out in the hall, and the facts had already been brought out; that there was "no doubt in his mind about it *now*." He also said he hadn't previously seen or said anything to Titus about Mrs. King's accident; that Stone was the family lawyer; and that Titus said Mrs. King's share of the recovery ought to be $5000.

He further denied his father had telephoned him personally the night before. He was sharply cross-examined by respondent's counsel as to whether he "could be honestly mistaken" in view of Mrs. King's testimony before the Advisory Committee, and he said it was possible; but that he was at work the night his father had testified to telephoning him, and he didn't get home until after midnight. However, he did say he was at the scene of the accident the previous night before the ▮▮▮▮ father and mother got there, and that he told his sister he would see her in the morning.

After seeing the witnesses and hearing the foregoing testimony from them, the Special Commissioner found against the respondent on the issue of solicitation of the damage suit. There is no basis on which we would be justified in overturning his conclusion drawn from the conflicting evidence.

▮ Respondent's defense to the complaint that he *improperly dismissed* the police court charge of careless driving against Mrs. King after becoming interested as attorney in her damage suit, is both factual and legal. First, he denies that he ever dismissed that charge; second, he contends no *valid* charge was pending against her. This latter defense is based on these facts. Under the practice in Independence there were three stages in such city prosecutions: (1) the arresting officers would bring in the culprit, and his name and the charge would be entered on the police blotter by the desk sergeant or the officer; (2) the city attorney would file a complaint; (3) when the case reached the hearing stage the police judge would enter it on his docket, together with continuances (if any) and disposition. Only the first step was taken in this case, on the police blotter together with an entry of dismissal thereon after the cause had been continued several times without entry.

Who made this entry of dismissal on the police blotter was not developed at the trial before the Special Commissioner. All that was shown was that neither the respondent nor the arresting office McMillen did it. But at the previous hearing of October 18, 1945, before the Advisory Committee respondent Titus testified that on the request of the attorney for the Public Service Company he continued both the city case against his client, the bus driver, and also the city case against Mrs. King. And he further said explicitly that after he got her contract of employment he, as police judge, dismissed the

city case against her for want of prosecution. At the trial before the Special Commissioner respondent further contended the city ordinances of Independence were confusing and technically insufficient to support the careless driving charge. But that point is not made in the brief here.

In our opinion the question before us is not whether the police records or the underlying ordinances technically were in due form. On the contrary the determinative question is one of professional rectitude, service to but one master, and absence of anything smacking of "squeeze plays." We sustain the Special Commissioner on this point. Canons of Ethics, Supreme Court, Rules 4.36, 4.47; 5 Am. Jur., §278, p. 428; 7 C. J. S. §23g, p. 756; In re Clark v. Williams, 233 Mo. App. 1174, 1188(6), 128 SW. (2d) 1098, 1105(5).

Finally, on counts 6 to 9 of the information, charging respondent Titus with soliciting personal injury suits against the A., T. & S. F. Ry. Co. from or on behalf of Mr. and Mrs. Jesse H. Quick and Mr. and Mrs. Clarence Trindle. The testimony on these four counts covers over 300 pages of the Special Commissioner's transcript. Necessarily it must be greatly condensed. The underlying facts were that Mr. and Mrs. Quick, Mrs. Trindle, Miss Bochert and Jesse Wheeler were riding in an automobile which was struck by a Santa Fe train at Henrietta in the early morning of November 23, 1944, Thanksgiving Day. All were injured, Miss Bochert and Wheeler fatally. They were brought by ambulance to St. Joseph Hospital, Kansas City.

All these parties lived in Ray or Carroll counties. Paul Herring, formerly a resident of the same vicinity, but at the time of the casualty of Kansas City, was a cousin of Wheeler's and a brother-in-law of Mr. Knowles, a member of the law firm with which respondent was associated. Herring testified that he learned of the casualty the day it occurred and went to the hospital to see his cousin, Wheeler. The latter's daughter complained to him that a third party had been at the hospital interviewing the injured persons [and it was true a Mr. Brown, representing the insurance carrier of the driver of the automobile had been there]. She asked Herring's advice. He said he would consult his brother-in-law, lawyer Knowles. Herring also saw the husband of Mrs. Trindle that day and mentioned the foregoing facts to him. Mr. Trindle said he too would "like to talk to somebody about the case [specifically mentioning Knowles] because it was all new to him and he didn't know what to do."

Continuing, Herring testified he went by the hospital the next morning and on down to Knowles' office, but Knowles said he "couldn't get away" and sent respondent Titus out to the hospital. Herring accompanied Titus, and introduced him to Trindle "as an attorney from Mr. Knowles' office." Titus and Trindle talked about the case and the latter said "I would be glad for you to handle this case." Titus said they would, and within 30 minutes Trindle had

signed a 50-50 contingent fee contract. On the evening of the same day Titus and Herring went down to Ray and Carroll counties "to investigate the accident and get witnesses." They saw Mr. Quick, one of the injured parties, who had been discharged from the hospital. They talked to him in Titus' automobile. Herring introduced Titus as a lawyer out of the office of his brother-in-law Knowles who had the Trindles' damage suit, and said Titus wanted to find out about the accident. Quick replied "Well if you are going to handle Mr. Trindle's case I want you to handle mine too." Titus wrote and Quick signed a contingent fee contract on a 50-50 basis. This was evidently done hurriedly, as Brown, the insurance man had driven up in his car and was trying to interfere.

On cross-examination Herring admitted he was the "go-between" in obtaining the two contracts; that it was the second time he had so served; that he was interested in getting the Trindle and Quick cases; that Knowles asked him to go to Ray and Carroll counties with Titus; and that he knew "the chief purpose of the whole matter was to get these cases if (he) could." He wanted to help the Trindles, but his "primary concern and interest was Mr. Knowles." He said he went to the hospital frequently, and was there with Knowles on Sunday, three days after the casualty. He introduced Knowles to Quick, and Quick introduced Knowles to Mrs. Quick as his (Herring's) brother-in-law and as *their* (the Quicks') attorney, whom he had been telling her about. She made no objection. Herring said he also took Knowles to Mrs. Trindle's hospital room, where Mr. Trindle introduced Knowles to her as his (Herring's) brother-in-law and *their* attorney. She, also, made no objection. On redirect examination Herring retracted his previous statement on cross-examination that his chief purpose in going to Ray and Carroll counties was to get the employment contracts, and said it was to get witnesses and evidence.

Respondent Titus testified that when sent to the hospital by Knowles on Friday, Trindle acknowledged he had talked to Herring and sent for Knowles; that he told him (Titus) briefly about the case; and said he wanted Knowles to handle it, after which the contract was written by Titus and signed by Trindle. Trindle further said he wanted Knowles to handle Mrs. Trindle's case, too. But that was not put in the contract; nor did he go into her room or talk to her. that was his only visit to the hospital. He agreed he went to Ray and Carroll counties on the same day with Herring, who introduced him to Mr. Quick, who said if Knowles was going to handle Trindle's case he (Quick) wanted "you fellows" to handle his also. Titus said he saw Mrs. Quick for the first time at her home after her discharge from the hospital. He went there with Knowles. The employment contract with Quick ran to Titus alone; the one with Trindle ran to

Sprinkle & Knowles *and* Titus. But he disavowed any financial interest in either.

Mr. Trindle, who lived at Hardin, in Ray County, learned of the automobile casualty in which his wife was involved and arrived at the hospital before she did. The next day Titus and Herring talked to him there. He testified Titus introduced himself as a lawyer and told him he ought to have someone to represent him and get the evidence; or otherwise the other side would get all the evidence and probably he wouldn't recover anything. Trindle said he was inexperienced in such matters, and he signed an employment contract. And he asked Titus to have Knowles handle his case. In four or five days he talked to his wife about it. He was sure he saw Titus there once after that, and also Knowles and Herring. He introduced Knowles to Mrs. Trindle. About a week or so after his wife's discharge from the hospital, Titus and Knowles came to the Trindle home in Hardin and talked about the case. His wife said she didn't want to have a lawsuit.

Mrs. Trindle testified she saw Titus once at the hospital about the middle of the week. The insurance man Brown had already told her not to worry about her doctor bill. Titus came in her room alone. She told him she was not going to sue anyone, and he told her to keep still and not let anyone hear her say that. Later Titus and Knowles came to her home at Hardin, and Knowles wanted her to sign a paper to go ahead with the case, which she refused to do. He told her not to talk to anybody, and she told him she had already signed a paper authorizing Brown, the insurance man, to see her doctor, which angered Knowles. Mrs. Trindle said she learned later that her husband had signed the employment contract with Titus.

Mrs. Quick testified her husband came to see her at the hospital for the first time on Sunday. Titus and Knowles came in with him to see her. *They* told her they were her lawyers employed by her husband, and that Titus worked with him. She didn't want a lawyer. Brown, the insurance man, had already told her her bills would be paid. She told them she didn't want to see anybody, and *they* warned her not to say that in front of anyone. *Knowles* came back the following Friday. He again told her not to talk to insurance men or anyone. And he said his contract with her husband covered both of them, and if she needed any money he would get it for her. She was in the hospital ten days and didn't see Titus there except on the first Sunday. On cross-examination it was shown that at the hearing before the Advisory Committee she had testified that on one occasion while she was in the hospital Knowles had asked her if she needed any money. Titus and Knowles came to see her after she returned home. They said she and her husband would have to have a lawyer to settle the case, and they would have to sue the automobile driver and the insurance company. She told them she didn't want to sue but they

insisted and said they could get more than she could. Later they filed suit and sent her a copy of the petition.

Still later Mrs. Quick and Mrs. Trindle went to Knowles' office and tried to get him to let the cases go, but he refused. But they, or one of them, had consulted other lawyers and knew they were not bound unless they had orally contracted to employ the Knowles firm. Knowles suspected Brown, the insurance man, had offered a settlement. In fact he said the two women told him they could get $5000 from Brown, as they later did, half from the insurance company and half from the railroad. And presently both women dismissed their suits that Knowles had brought.

Mr. Knowles, who testified at length for respondent, corroborated in general the testimony of Titus and Herring so far as it covered the foregoing and subsequent events within his knowledge. Further, and in particular Knowles paralleled Herring's testimony that they had called at the hospital on Sunday, and that Knowles had been introduced by Quick and Trindle to their respective wives as *their* attorney, to which the wives agreed. With reference to Mrs. Quick's financial situation, Knowles said she had bought or was buying a house, and he told her he would try and get a loan for her.

The testimony of the two women is somewhat contradictory and full of "don't remembers" on cross-examination. But there can be no doubt that they recognized the Knowles employment for a time by coöperating with the Knowles firm, furnishing information and complaining of the delay in pressing the litigation. They said they did that because they were told the employment contracts signed by their husbands bound and covered their claims, making a sort of derivative employment. And it is true the Quick contract employed Titus to represent "me and my wife," both of whom were in the collision. The Trindle contract required counsel to represent "us" and he was not in the collision. When the two women learned from outside lawyers they were not bound unless *they* had orally con- tracted with the Knowles firm they repudiated the employment. But from the standpoint of respondent Titus in this proceeding we think it must be regarded as a solicited employment, at least as to Mrs. Trindle, though derivative, because it was treated by both parties for a time as an employment. Mr. Knowles testified he did not rely on the derivative employment, but on the asserted fact that the two women voluntarily and expressly agreed orally to the attorney and client relation. And if that be true respondent is all the more guilty if the employment was solicited, as we find it was. Supreme Court Rule 4.28.

Neither is Titus exculpated by the fact that Herring, with whom Titus worked, was Knowles' brother-in-law. It is true the relative of a lawyer is free to recommend that lawyer to persons seeking legal advice or service. But the situation is different where the lawyer

sends his associate out with that relative, both having the objective of obtaining the employment. Nor is the situation altered by the fact that the litigation subsequently fails or is withdrawn. In this case respondent Titus had the signature of Mrs. Trindle's husband on an employment contract within 30 minutes after meeting him, and the signature of Mrs. Quick's husband on another contract that evening in competition with Brown, the insurance man. And Herring, who accompanied him, testified in chief that his main purpose was to *obtain the employment* for his brother-in-law Knowles.

The learned Special Commissioner found against respondent Titus, as to the solicitation of Mr. Trindle, but in respondent's favor as to Mrs. Trindle, Mrs. Quick and Mr. Quick. We can see no reason why respondent should be exculpated as to Mrs. Trindle, even on the theory of derivative employment through her husband's contract, since the Commissioner found that contract was solicited.

But with reference to Mrs. Quick, the situation is different. She denied ever having made an employment contract with respondent Titus, and her husband, who had made such a contract, testified he *asked* Titus to take the case and that Titus did not solicit him. In our opinion the evidence failed to make a case of solicitation as regards Mr. and Mrs. Quick, but did with respect to Mr. and Mrs. Trindle.

We therefore find respondent guilty as charged in Count 1 of the information of changing the written statements of witnesses Stanley Smith, Charles House and Mrs. Charles House, and thereafter using or permitting the same to be used in the cross-examination of witnesses in the trial of the case of Cline v. Tobin Construction Company in the Jackson County circuit court.

We further find respondent guilty as charged in Count 4 of the information of soliciting employment as attorney from Morris F. Hall in a contemplated suit for personal injuries sustained by his minor son, on or about April 13, 1943, in Kansas City, Missouri.

We further find respondent guilty as charged in Count 5 of the information of soliciting employment as attorney from Mrs. Dale King while he was the duly qualified and acting Judge of the Police Court of Independence, Missouri, in a contemplated suit for personal injuries sustained by her and her minor child in said city on or about January 22, 1944.

We further find respondent guilty as charged in Count 8 of the information of soliciting employment as attorney from Flora Trindle in a contemplated suit for personal injuries sustained by her on or about November 23, 1944.

We further find respondent guilty as charged in Count 9 of the information of soliciting employment as attorney from Clarence Trindle in a contemplated suit for personal injuries sustained by him on or about November 23, 1944.

· Under Rule 5.10 we assess respondent's punishment at suspension from the practice of law in all the courts of this state for the period of two years from the date of judgment, and until the costs, as determined by the court, be paid. All concur, except *Tipton, J.,* not sitting.