In re Robert Yeager WOODWARD, an Attorney.

No. 45324.

Supreme Court of Missouri, En Banc.

April 8, 1957.

William W. Crowdus, St. Louis, Edward E. Murphy, Jr., St. Louis, for informants.

Robert Y. Woodward, St. Louis, for respondent.

EAGER, Judge.

.The information in this cause was filed by leave in this court on December 13, 1955, by the members of the Bar Committee for the Eighth Judicial Circuit; therein they seek the disbarment of respondent, Robert Yeager Woodward. The information is in ten counts. Mr. Woodward will hereinafter be referred to as the respondent; his office has been in the City of St. Louis. A citation was duly issued to respondent and thereafter he filed sundry motions which the court overruled. Answer was then filed, and in so far as it may be necessary in discussing the issues, that answer will be referred to.

Count I of the information charges that respondent had, for the past 7 years and prior thereto, followed the practice or custom, "as a course of conduct, of accosting persons appearing in the corridors of the Municipal Courts Building * * * in the City of St. Louis, Missouri, for the purpose of soliciting such persons to employ him in cases pending in said Municipal Courts." Counts II–IX, inclusive, charge specific solicitations of various persons, respectively, to-wit: Henry Rosenblum, John Francis Cronin, Jr., Theodore McMillian, Edward T. Willman, Fred Puckett, Oliver Winston Pierce, John C. Whitman and Ronald Gerhardt. The Puckett Count (VI) also charges a failure by respondent to perform the duties incumbent upon him when employed, in that he permitted a default against his client. Count X charges that in January and March, 1947, respondent mailed to sundry persons in the City of St. Louis postal cards containing such statements as "Republican City Court Ring—Nazi—Fascist Spirit"; "2nd Inquisition Corr(eg)idor"; "Perjury—Duress—100% Pure Kangaroo." In general, respondent denied all the charges, except as to the mailing of the post cards, which he sought to explain; he further asserted his constitutional right of free speech as a justification for talking to any and all people in the Municipal Courts Building. Certain incidental defenses and contentions will be referred to later.

The investigation by the Bar Committee was begun prior to April 23, 1948; the original investigation involved the mailing of the post cards and certain complaints not now in issue. Respondent was present in person on that date and was represented by counsel. In the course of the questioning and discussion, respondent admitted mailing 25,000–30,000 of such cards, of 30 or 31 different types, and admitted that he had done "a damn fool silly thing," but he also sought to excuse his action as a political activity. The committee then told him that it had also received prior complaints concerning him, but that all proceedings to that point were secret; it was also stated that, in view of his attitude and his statements to the committee, the latter would "continue the case generally," relying upon him to follow the rules, to refrain from solicitation, and to conduct himself properly. However, the committee also informed him then that there was no limitation on any of the charges, and that they could and would be revived if further offenses were committed. Thereafter from time to time additional complaints were received by the committee and additional hearings held, periodically, from October 28, 1949, to December 10, 1955; during that period or immediately prior thereto, six of the present complaints originated. In most instances informal investigatory hearings were first held before the com-

mittee, but in all instances now involved, respondent was thereafter given due notice and a copy of the transcribed evidence, followed by formal hearings and a full opportunity to cross-examine all witnesses who had given testimony against him. See Rule 5.03. 42 V.A.M.S. Respondent was consistently given an opportunity to produce evidence in his own behalf; he did testify himself, and made many oral statements which appear to have been considered, informally, as evidence. The evidence brought here consists of one volume of 378 pages, and eight smaller volumes. It is obvious that we may not, within the normal scope of an opinion, review each and every charge in detail. As a preface to any review of the evidence, we may state that every charge, except Count X, is based upon alleged solicitation in the corridor of the Municipal Courts Building, and that all the persons supposedly solicited were, with the exception of Theodore McMillian, ones having actual traffic tickets or some other form of summons to appear in a City Court.

█ Following the filing of the answer, this court appointed the Honorable John W. Calhoun as Special Commissioner to hear evidence and to report his findings of fact and conclusions of law. The Informants, by counsel, and respondent in person appeared before him and called attention to a prior written stipulation that the cause should be submitted to him on the written transcripts of the evidence theretofore taken at the various hearings before the Committee, the exhibits, and the statements there made; upon the offer of the Committee to introduce its records to show compliance with all formal requirements (a right reserved in the stipulation) respondent conceded "that all proceedings before the Committee were in due form, * * * and that every matter pending before the Commissioner at this time is properly before him under the Rules * * *." Before proceeding to the merits of the respective charges, we note the repeated insistence of respondent that

on one or more older charges which were "continued generally" by the Bar Committee he should be peremptorily discharged, citing Rule 5.03. As indicated above, he was fully informed on this subject at the time of the original hearings. It appears to us that the Committee was, to use a homely phrase, "trying to give him a break," which he did not at the time and does not now appreciate. There is no statute of limitations in such proceedings; respondent was periodically, if not continuously, made aware of the filing and hearing of new complaints against him from 1948 to December, 1955. In determining from all the evidence whether there was probable cause to believe respondent guilty of professional misconduct, the Committee could properly consider all matters in which respondent had received due notice and had been afforded the right of cross-examination. His motion to dismiss was properly overruled.

██ The Special Commissioner has filed a full and comprehensive report in which he finds respondent not guilty of the charges embraced in Counts I to V, inclusive, but guilty of the remaining charges. He has recommended a suspension from practice for the period of one year. We shall not be able to review or digest these findings in the present opinion, but we have considered them fully. It is the duty of this court in such a case to make its own findings, the report of the Commissioner being advisory. In certain respects we are constrained to differ with the Commissioner. The evidence here was voluminous, and perhaps it was impracticable to produce the various witnesses anew before the Commissioner; however, the necessary effect of stipulating that he should hear no oral testimony, but should determine the matters upon the evidence heard by the Committee, deprives this court entirely of the benefit of the impressions, views and findings of the Commissioner on the credibility of witnesses, as based upon their appearance and conduct. In any such case the Commissioner is in no better position

388

to judge of credibility than are we. Generally speaking, that practice is not to be encouraged.

█ We shall now consider the various counts on the merits, as briefly as may be. We hold that the charge in Count I of a practice and custom of "accosting * * * for the purpose of soliciting" is the equivalent of a charge of "solicitation of business * * * by personal communications or interviews, not warranted by personal relations," as proscribed in Rule 4.27. We shall also consider on this Count the evidence received on Counts II to IX, inclusive, for all of it involves matters within the period charged, and offenses of the same character. In addition to a general denial on this Count, respondent has alleged that over a period of years he has rightfully talked to thousands of people in that building, pursuant to his constitutional right of free speech. By the evidence of witnesses and from admissions, direct or implied, of the respondent himself, it is clear that he habitually arrived at the Municipal Courts Building about 8:00 a. m. every morning, five days a week, and stationed himself in the corridor. The court sessions began at 9:00 a. m. After court convened he would be in the courtroom at times, and at other times back out in the corridor; he usually remained until approximately 10:00 or 11:00 a. m. Essentially, respondent stated in this court, when orally arguing his case pro se, that he went there early every morning because many times he had cases on the docket, and because he also wanted to put himself in position to get new business. We may fairly assume from all the evidence that the latter was and is true. This practice had been in effect since 1941. None of the persons supposedly solicited as charged in Counts II to IX, inclusive, had ever known respondent. Several witnesses (in addition to those involved in the specific counts) testified to having seen respondent walk up to persons coming down the corridor or entering the building, and appear to stop them and engage them in conversation; and that people who had already inquired for directions to the court would be seen to stop and converse as they came abreast of respondent. These occurrences were said to have been very frequent, perhaps several times a day. In most instances these witnesses did not hear the actual conversations; one testified that on one occasion respondent had said to such a person: "Can I help you?" These witnesses were: a parole officer, a policeman assigned to the corridor, a newspaper reporter, and certain young lawyers who had been assigned to an information desk in the corridor, which was operated under the auspices of the St. Louis Bar Association. Respondent attacked the credibility of these witnesses violently, for reasons shown generally in our discussions of Counts IV and X. Our conclusion is that all this testimony cannot be untrue; perhaps, standing alone, it is somewhat lacking in proof of the element of solicitation, but we think that the specific evidence produced under the other counts supplies that element, and raises an impelling inference of respondent's purpose in "accosting" these people. So considered, we rule that the evidence, as a whole, is inconsistent with any "reasonable theory of innocence," as that term is used by our Commissioner. Our principal point of difference with the Commissioner here lies in the fact that we are considering also the specific evidence adduced under Counts II to IX, inclusive, as evidentiary of a practice, whereas he, apparently, did not do so. We find respondent guilty of the charges averred in Count I.

Count II charges the solicitation of one Henry Rosenblum in September, 1948. Respondent denied the solicitation, insisted that the only complaint actually made was of delay in getting a damage suit to trial, and that he eventually effected a settlement after trial and appeal. The only question here is whether or not there was actually a solicitation of Rosenblum's claim or controversy. We are not interested in the result. Henry Rosenblum and three other young men riding in an automobile had been in a collision with a bus in June, 1948;

both Henry and the bus driver received traffic tickets. Henry was injured somewhat, as were supposedly all the other boys. At some date thereafter, in answer to the summons, Henry, his father Morris Rosenblum, and the three other boys appeared in the Municipal Courts Building about 8:15–8:30 a. m. The father testified that when they arrived in the corridor respondent came up smiling and said, "Where are you boys going?" The father told him that they had to answer an accident charge, whereupon respondent asked and stated: "Have you got a lawyer? * * * I am a lawyer." The father then indicated that they would like to "get hold of one," so respondent passed around his business cards, and the father said, "You are just the man I am looking for," whereupon respondent proceeded to "take the case," discussed the facts to some extent, and immediately wrote up a very sketchy 50% employment contract on the back of his professional card. The father and his two sons signed this. There was some evidence that respondent agreed also to handle the traffic charge without fee, and appeared with them in the City Court; in any event, that case was continued, and it was eventually dismissed. Respondent filed suits against the Public Service Company for the various injured parties. The son, Henry, testified generally to the same effect as did his father, except that he said that respondent approached them as they were leaving the court; he testified that respondent came up and said, "You are in court for a case of some kind," and that he "would like to take the case"; he further testified, specifically, that—"We were standing talking about something and he approached us. He walked right up and told us he would like to take the case," or, in substance, "that we were in trouble and we needed a lawyer." The son admitted hearing his father say: "You are just the man I am looking for," but that this was "after the introduction and everything else." Respondent's explanation of this occurrence was that Mr. Rosenblum "happened to notice my Legion button," and started a

conversation, in the course of which he remarked that Woodward was just the man he was looking for. It seems hardly conceivable that this remark would have been made without some direct or indirect inducement on the part of respondent. While there is a minor inconsistency between the testimony of the father and the son as to the place and time of the conversation, they agree on the substantive aspects; nor was their evidence changed on cross-examination. It is immaterial here that delays in the litigation may have been the primary causes of dissatisfaction and of the making of the complaint to the committee; it is also immaterial that Henry Rosenblum continued to accept respondent's services in the litigation. The only issue is: was there an improper solicitation of the business in the first instance? We find from a preponderance of the evidence that respondent did improperly solicit this representation, and that he is guilty of the charge.

At this point we pause to make a few comments which may enable us to shorten our recitals of the subsequent occurrences. Before the Committee respondent said that "solicitation is a matter of technical interpretation," and that he did not believe he was soliciting business. He expressed the hope that he could finally "draw a line" of demarcation, but, as already demonstrated, he continued thereafter his adopted course of conduct throughout the years involved. It seems apparent from the whole record that respondent felt: (a) that if persons spoke to him first asking casual information, it was entirely proper for him to tell them that he was a lawyer and to offer specifically to assist in their matters; and (b) that it was also proper for him to start a casual conversation with any one, and if, in the course of that conversation, the person addressed disclosed that he was answering some charge or summons, respondent might properly tender his services. As will be indicated later, we disagree in both particulars. It is also apparent that respondent was persistently skirting the border line of

prohibited conduct, even on his own tenuous theory of ethics. In the course of various conversations, respondent rather consistently told the persons involved that he, being a lawyer, could have that particular case called early on a preferential list, which would enable the defendant to get away without waiting all day, or substantially so. That this method was successful is illustrated in sundry instances. Respondent testified (or stated): that for years there had been much controversy between him, on one side, and the judges and attachés of the City Courts, on the other, regarding his supposed habitual solicitation of cases; that he had maintained his right to speak freely to anyone in the corridors of a public building; that certain officials of the City Courts had procured affidavits and made complaints to the Bar Committee concerning him; he, on the other hand, charged that certain of the lay officials were "handling cases" on the side, and were thus depriving him (and other lawyers) of business which he considered legitimately his. In the course of these controversies one of the St. Louis newspapers published an article which respondent felt accused him of habitual solicitation of City Court cases and improperly disclosed complaints to the Bar Committee. He promptly filed suit for libel. The case was eventually settled for $500 on the eve of trial, during 1949. Such constitutes part of the background behind some of the charges, particularly Counts IV and X.

Count III charges the solicitation of one John Francis Cronin, Jr. Respondent denied the solicitation. Mr. Cronin, then 17 years of age, entered the Courts Building on January 7, 1949, at about 8:30 a. m. with a speeding ticket. His testimony was that just as he walked into the upstairs corridor, a man approached him and asked where he was going; Cronin told the man that he was going to Court No. 2 to pay a fine at 9:30; this man said that he would take care of it for him, and asked to see the ticket; he took the ticket and then said that he could take care of it for $17, but finally took from Cronin $15, which was all the latter then had. This man gave Cronin his card, told him that he was Robert Yeager Woodward, that he was a lawyer, and that he would take care of the ticket. Cronin left the building and thought no more of the matter until he was called later by the marshal and required to go down and pay a fine and costs, totalling $18. It developed that respondent had continued the case, and had later overlooked it; he sent $18 to Cronin with a letter of explanation and apology. On cross-examination Cronin was uncertain of Woodward's identity, but it was conceded by respondent that he was the person referred to. Respondent's version was that the clerk pointed him out to Cronin as a lawyer, and that Cronin, who wanted to get away, began a conversation in which Woodward suggested that he, as a lawyer, could accept the money and take care of the matter for him. Respondent has made much of the fact that Cronin was an employee of the newspaper against which he had a pending libel suit, and that, after the occurrences just related, an attorney for the newspaper called respondent's office associate, told him of the occurrences just related and supposedly added: "You tell Mr. Woodward to dismiss his * * * suit * * * or else," and that "Woodward * * * will know what I mean." The inference, of course, is that this attorney was threatening to present this matter to the Bar Committee unless the libel suit was dismissed. Unethical as such conduct might be, if the accusations are true, it has nothing to do with the question before us. Cronin was a mechanical employee, and had nothing to do with the pending suit. If he was solicited by respondent, that act was completed long before the company's attorney ever heard of it. We find nothing in the subsequent occurrences which causes us to disbelieve his unequivocal testimony. Nor are we impressed with the fact that Cronin failed to remember certain phases of respondent's claimed conversations, such as a discussion of the libel suit. We find respondent guilty of the charge of solicita-

tion contained in Count III. This finding is in nowise based upon respondent's error in overlooking the setting of Cronin's case and permitting a default.

Count IV charges the solicitation of Theodore McMillian. The latter was then a young lawyer, very recently admitted to the practice. It was conceded that an attorney for the newspaper libel-defendant had procured McMillian, for a fee, to dress in old clothes and go to the Municipal Courts Building on September 27, 1949, with a $10 bill and a slip of paper such as one is given when "out on bond," to see if he would be solicited by respondent. McMillian did so go there at about 7:45 a.m., holding the money and the supposed summons in his hand; from his testimony we are convinced that he was, in fact, very promptly approached and solicited by respondent, who took from him $3 as a fee and his driver's license, and thereupon left the corridor to have the case advanced on the docket for an early call. Instead of waiting as instructed, McMillian left and reported back to the newspaper's attorney. He later got his license back, at the time the libel suit was settled. McMillian was very frank in his testimony, and admitted that although there was in fact no charge against him, he told respondent that there was a traffic charge against him for overparking. Respondent stated, rather vaguely, that he thought perhaps McMillian had inquired for him; his chief defense to this charge, however, was entrapment. That is primarily a doctrine of the criminal law. This is not a criminal case and we doubt that the doctrine is strictly applicable. However, entrapment does not appear to be a defense even in criminal cases, where one has merely afforded the defendant an opportunity to commit a crime, and the criminal intent originates in the mind of the defendant himself. State v. Hicks, 326 Mo. 1056, 33 S.W.2d 923; State v. Waghalter, 177 Mo. 676, 76 S.W. 1028; 15 Am. Jur., Crim. Law, §§ 335–336, pp. 24–26. The theory of entrapment, as such, is not a defense here. Technically speaking, we think that an act of solicitation was accomplished here; but we are unwilling to find respondent guilty of this charge under all the circumstances related, and particularly since the supposed victim was himself cooperating, knowingly, in the solicitation, and the supposed subject matter of the solicitation was wholly fictitious. This does not mean in any sense, however, that law officers or bar officials may not observe or gather evidence of illegal or unethical acts in divers and sundry ways. See 20 Am. Jur., Evidence, § 400, p. 361. Nor does it mean that advertising by a lawyer, in violation of Rule 4.27, may not be an offense, without any specific subject matter or case being apparent. We find respondent not guilty of the charge presented in Count IV, but we consider the evidence of his actions therein as corroboratory of other evidence of his custom and practice.

On Counts V (Willman, 1952), VI (Puckett, 1953), VII (Pierce, 1954), VIII (Whitman, 1954), and IX (Gerhardt, 1955), we shall not attempt to relate the evidence. We have considered all of it in detail, both pro and con; we are forced to give merely a "general picture of respondent's misconduct," as we view it. In re Applewhite, Ky., 297 S.W.2d 910, 912. Each of these charges involves the specific solicitation of an actual defendant in the City Courts. Respondent has denied all such solicitation. The Puckett Count (VI) also includes the additional charge that respondent permitted the prosecution against his client to go by default, resulting in an unpaid fine and an incarceration in the workhouse; on this feature respondent cites: In re Mason, Mo.App., 203 S.W.2d 750. Allowing to respondent the benefit of all doubt, we consider that this additional charge involved a somewhat human error on dates, and thereon we find respondent not guilty.

Generally, in each and all of these instances and on all such charges, namely V to IX, inclusive, we find from a preponderance of the evidence that respondent voluntarily approached, encountered, or

stopped these persons in the corridor of the Courts Building with such remarks as: "What have you got"; "Have you got a ticket"; "Do you want a lawyer"; "Can I be of any help to you"; "Wait a minute, let me see what this is all about" (when Whitman inquired for directions as to the place); or "What was he here for." We are convinced that in each and all of these instances, respondent "accosted" the persons in question and initiated conversations with the purpose and intent of procuring, and that he thereby did procure, employment from them. It is true that in one or two cases his employment was soon revoked, but we regard that as immaterial. Respondent's denials of these solicitations do not impress us. In most of these instances and, by his own statement, in substantially all matters arising after the very early charges, respondent required the respective defendants to sign a little yellow slip bearing the following words, written in longhand, and preceded by the date: "I employ R. Y. Woodward as my lawyer of my own free will and without solicitation or approach." Some of the people disclaimed knowing what they had thus signed. Respondent stated that he usually carried several of these slips with him at all times, so that he would not have to stop to write one out; his explanation was that he was thus protecting himself against charges of solicitation as made by the unfriendly officials in the City Court, and against attempts to "entrap" him. Throughout the hearings respondent considered and offered these slips as evidence of the highest order to show that he had not solicited those cases. We regard them as evidence tending to indicate the contrary. In various conversations respondent used the suggestion that by employing him, a lawyer, the case would be placed on a preferential list for early call and disposition, thus eliminating a long and tedious wait. This approach seems to have been eminently successful, for most of these people intended to plead guilty and pay fines. Certain of the persons now involved appear to have been entirely

willing to employ respondent after he had made his proposition, but that is not the point with which we are concerned. The last of these instances occurred on November 9, 1955, approximately one month before the formal complaint was filed; this, to our minds, indicates the enormous persistence with which respondent pursued his established course, despite the continuous red lights which had been displayed on that course over a period of seven years.

During the latter part of the period involved, the Bar Association of St. Louis maintained two information desks in the corridor of the building in question. These were manned through and by a committee of young lawyers. Their functions were to give out information as to the locations of the courts, the probable amounts of fines and costs, and to be generally helpful, without charge or fee; they were also authorized to refer persons requesting a lawyer to the Legal Reference Bureau of the Association, where lawyers who so desired might register and accept (presumably in rotation) such referred cases for fees which were regulated, at least up to a certain point. These gentlemen were also expected to report any actual misconduct which they might observe on the part of members of the bar. Respondent objected violently to the presence of these booths and to the signs which announced: "Court Information. Bar Association of St. Louis * * *." He accused these gentlemen of soliciting, because they might perchance refer persons to the Legal Reference Bureau. Such is not an issue here; the members of that committee are not on trial; Mr. Woodward is. And it may be stated here that the operation of Legal Reference Bureaus, or Lawyer Referral Services, to which persons of limited means may be referred for legal services and for regulated fees, has been widely recognized and commended as a public service. See, By-Laws, American Bar Ass'n (1956–1957) art. X, §§ 6 and 7; list of Committees of The Missouri Bar (1956–1957), including Committee on Le-

gal Aid and Reference. In certain of the matters here involved, lawyers from this Bar Association information service asked the supposed "solicitees" if respondent had voluntarily stopped them or approached them, and were told that he had. In some instances this resulted in such persons asking, and getting, their money back, on the theory that they did not need a lawyer. Respondent has objected violently to that conduct, and he urges here that the testimony and complaints of those witnesses were *induced* by the members of the committee. Nevertheless, the witnesses did testify, they were cross-examined fully, and their evidence appears entirely worthy of belief. The objections are beside the point.

We find respondent guilty of the charges of solicitation contained in Counts V to IX, inclusive, and each of them. The discipline to be imposed, however, is based upon respondent's conduct as a whole over a period of years, so that our finding on any particular charge is not controlling, or perhaps too material, in fixing the measure of discipline.

■ We shall discuss Count X briefly. As stated, respondent admitted sending out by mail in January and March, 1947, 25,-000 to 30,000 post cards to persons whose names he got from the city directory, the telephone book, and registration lists of voters, as well as to persons of his acquaintance, including lawyers. These cards were sent out in 30 or 31 varying forms or "editions." Generally, some or all contained the following words and phrases, among others: "Republican City Court Ring"; "Perjury and Duress"; "2nd Inquisition of Corr(eg)idor"; "Stooges * * * by armed power draw up false affidavits"; "100% Pure Kangaroo"; "Ring has * * * coached witnesses in Perjury"; and "Nazi-Fascist-Spirit." The cards bore Woodward's name and address and indicated a high degree of resentment that his right to talk to any one in a public building had been questioned and attacked. Some of these cards bore draw-ings of snakes and kangaroos (in realistic vein, if not artistic) and many bore draw-ings of the Nazi swastika, these usually appearing on the snakes. In many of the cards it was rather hazily indicated that the court or courts had hailed respondent in, informally, "without due process," and by "armed power," to question him on false accusations of solicitation; also, that the courts had in some devious manner released to a newspaper information of complaints against him (formal or informal) of solicitation. The explanation by respondent of his actions is that he had, in effect, been persecuted on false charges of solicitation, that the newspaper had run a libelous article about him, that court attachés were illegally handling City Court cases, and generally, we might say, that he was being "kicked around." We do not find, however, that the persecution ever accomplished a cessation of respondent's activities. Respondent also insists that these cards were sent out in a spring election campaign and as political data, and that he was not attacking the courts for any legal or judicial rulings but only for their unauthorized conduct beyond the bounds of their authority. We need say no more on this subject. Rule 4.01 of the rules of this court, being an integral part of our Canon of Ethics, enjoins on all members of the bar the duty of maintaining a respectful attitude toward the courts, for the maintenance of their position and importance. No reasonable person could doubt that the statements on these cards (though jumbled and rambling) would, if believed in even the slightest degree, tend to lessen the respect of the recipients for the City Courts of St. Louis. Neither the right of free speech nor the right to engage in "political" activities can be so construed or extended as to permit any such liberties to a member of the bar; respondent's action was in express and exact contradiction of his duties as a lawyer. A layman may, perhaps, pursue his theories of free speech or political activities until he runs afoul of the penalties of libel or slander, or into some infraction of our

statutory law. A member of the bar can, and will, be stopped at the point where he infringes our Canon of Ethics; and if he wishes to remain a member of the bar he will conduct himself in accordance therewith. We find respondent guilty of the charges contained in Count X. His expressed penitence in 1948, with regard to these cards and generally, has not been consistent with his conduct in other respects since that time.

It is hardly necessary to say that solicitation by members of the bar has been expressly condemned in numerous Missouri cases. In re Titus, Banc, 359 Mo. 1070, 225 S.W.2d 715; In re Veach, Banc, Mo., 287 S.W.2d 753; In re Gallant, 231 Mo. App. 150, 95 S.W.2d 1249. In citing the last mentioned case we do not mean thereby to approve the extent of discipline there imposed. Little more need be said here.

We deem it unnecessary to pass upon respondent's objections and exceptions to the report of the Commissioner; it is our duty to review the evidence here, and we have done so. The Commissioner's findings and conclusions are merely advisory; we regret that we have been unable to set them out, or to refer to them in detail, in the space allotted to an opinion which is already too lengthy. We have concluded that the discipline recommended by the Commissioner, namely, a suspension from practice for one year, is inadequate. It is true that the Bar Committee states that it adopts that recommendation, but, after all, the final responsibility lies directly on the shoulders of this court, which long ago assumed that burden. We have considered the almost inconceivable persistence of respondent's conduct, continuing as it has in the very face of sundry warnings and hearings. It is obvious that many of the persons with whom respondent dealt were probably getting their first view of the legal profession in these contacts. As counsel have said, these were "grass roots" courts, where the ordinary person has his first experience with the administration of justice. Regarded in that light, the offenses were of high importance.

 The respondent, Robert Yeager Woodward, will be suspended from the practice of law, by reason of the charges of professional misconduct of which he has now been found guilty, considered in the aggregate, for a period of three years from the date of the filing of this opinion. The costs will be taxed as recommended by our Commissioner, namely, one-half against respondent, and one-half against the Informants. It is so ordered.

All concur, except STORCKMAN, J., not sitting.