98

In re Robert C. Frith, No. 41786—233 S. W. (2d) 707.

Court en Banc, November 13, 1950.

*Louis H. Breuer* and *Forrest P. Carson* for informants.

*Arch B. Davis, Don R. Black* and *J. V. Gaddy* for accused.

[707] LEEDY, J.—This is a disciplinary proceeding against Robert C. Frith, an attorney at law (who will hereinafter be referred to as respondent), instituted in this court, by leave granted the Advisory Committee under rule 5.03. The information is in ten counts, each charging specific acts of professional misconduct. Hon. Roy B. Meriwether, Judge of the Tenth Judicial Circuit, ordered transferred to this court (under § 6, Art. V, Const. of Mo. 1945) to serve as special commissioner herein, in an able and exhaustive report of his findings of fact and conclusions of law, found respondent guilty on each of ten counts and recommended that he be suspended from the practice for a period of three years.

Five of the charges grow out of divorce cases in which respondent acted as an attorney, and five of them have to do with alleged solicitation of business, personally and through lay agents or runners, and dividing his fee for legal services with, or paying such agents or runners. The runner involved in four of these charges is the same individual, Fred Walker of Chillicothe.

The applicable legal principles are few. Indeed, the qualifications of a lawyer and his duty to the court and to the public are so well defined by the canons of ethics embodied in rule 4, and understood by the practicing bar, as to make discussion of them unnecessary, in view of the situation here presented, which is basically one of fact. The proposition relied on by respondent is that the evidence does not justify a finding of guilty as to any count of the information. A review of the evidence is therefore required. There were several hearings before the Advisory Committee prior to the filing of the information. The transcripts of the testimony taken at such hearings were, by agreement, introduced before the special commissioner, so that of the record before us, about 900 pages represents the oral testimony. Consequently, having regard to the space limitations of an opinion, it will be impracticable to develop the considerable number of collateral matters gone into upon the several hearings, or to do more than state the substance and effect of the testimony as the same is deemed to have a material bearing on the fact issues presented.

Respondent, 51 years of age, is a native of Livingston County, and he has resided there practically all his life. He was graduated from Law School in 1925, and, with the exception of two years, he has practiced at Chillicothe since 1926. He was City Attorney for

eight years; Prosecuting Attorney two years; member of the Board of Education about seven years, and still serving at the time of this hearing. For about two years during the recent war, he was employed in Kansas City by the Reconstruction Finance Corporation, an instrumentality of the United States Government.

### COUNT I—The Bradley Case—(1941)

This was an action for damages, filed by respondent as attorney for Mrs. Glenn Bradley of Trenton for personal injuries allegedly sustained by her as the result of a fall while crossing an overhead pedestrian bridge across the Rock Island tracks in [708] Trenton. This solicitation is alleged to have occurred in October, 1941. Only two witnesses testified concerning this matter, Walker and respondent, and their versions (both here and in the other cases) are in· such sharp and direct conflict as to foreclose any possibility of reconciling them. Walker testified that (the time and place he did not undertake to fix) respondent had approached him with the proposition that "if I could get any damage cases for him, we would go 50/50;" respondent came to, and importuned the witness to "make an effort" to get the Bradley case for him, adding "it was an awful good case, if he could get it." Witness did not recall whether he made a special trip to Trenton for the purpose, but he did go there, and saw the woman's husband at the Lafferty Drug Store where he worked (Mr. and Mrs Bradley were separated), got his permission to talk to the wife, and did so; but Mrs. Bradley was not interested, and he so reported to respondent. Walker returned later and again talked to her, at which time she told him "I could bring Mr. Frith over and she would talk to him." He did so, and Mrs. Bradley was still not interested after talking to respondent. He returned another time and talked to Mrs. Bradley, after which he again took respondent to see her, and at which time she gave him the case. It was finally disposed of by compromise and settlement for $750.00. Walker further testified that at the time of the settlement, he and the respondent went to Trenton from Chillicothe, and the Rock Island claim agent, in his (Walker's) presence, delivered, as he recalled it, two checks to respondent; that he and the respondent then went to the drug store, procured the husband's endorsement on the checks, then "we went across the street and made a settlement with her [Mrs. Bradley] and came on to Chillicothe." He further testified that respondent, after giving him $80.00 in cash in his (respondent's) office, sent an employe to the bank with the Rock Island draft, and upon getting the money thereon, paid him the balance of the sum to which he was entitled under their agreement (50% of respondent's fee), and that their settlement "was absolutely O. K."

Respondent denied that he had ever proposed to Walker that if the latter would go out and get cases for him, he would divide the fees, evenly or otherwise; and denied he had ever given Walker any part of any fee.

His version of the Bradley case was that Walker contacted him four or five times about it, and that finally, while in Trenton on other business, and upon Walker's insistence, he did go and talk (separately) to the Bradleys; that he told Walker he couldn't see anything in the case; that he did not take a contract until after he had contacted the Rock Island adjuster and ascertained the railroad considered it a meritorious case; and that after "rather short" negotiations it was settled for $750.00.

He further testified that Mr. Bradley did not want, nor did he receive any portion of the proceeds of the settlement; that he (respondent) got the release signed by Bradley first and then by Mrs. Bradley, then delivered it to Mr. Caldwell, the claim adjuster, who gave him a draft—"just one draft"—payable to Mr. and Mrs. Bradley and himself; that he took the draft to Mr. Bradley, who endorsed it, and then took it to Mrs. Bradley, and she signed it; that because Mrs. Bradley did not want to deposit the money in a Trenton bank, he took the draft and deposited her half of it in an account he opened for her in a Chillicothe bank. He further testified that Walker was not with him when the draft "was made," nor was he back at Chillicothe when he took it down there; that Walker's connection with the case was in the capacity as an intermediary between Mr. and Mrs. Bradley, who, as hereinabove noted, were estranged; that Walker never at any time said anything about wanting any part of the proceeds of the settlement, nor did he ever give him any of the same. Respondent, while denying that Walker was with him when the settlement was closed and the endorsements of Mr. and Mrs. Bradley were procured on the draft, nevertheless admitted on cross-examination that "he [Walker] might have been with me when we got the release signed, not when we endorsed the draft;" and that it was his recollection that the release and drafts [709] were procured the same day. He was asked again if he was sure that Walker was not with him when he was procuring the endorsements of Mr. and Mrs. Bradley on the draft, to which he replied: "I am sure of this much, that he was not with me when I procured Mrs. Bradley's endorsement on it."

## COUNT II—The Sanson Case—(1944)

This charge grows out of an automobile accident which occurred on the highway near Chillicothe during the early morning hours of July 9, 1944, in which Mrs. Paul Sanson was killed, and two others (Mrs. Jesse Allnutt and a boy, Lee Douglas, a nephew of Sanson, who were riding in the Sanson car) were injured. Walker

testified that about 10 o'clock that morning, respondent came to his home, told him of the fact of the accident and of Mrs. Sanson's death, and stated, "It is a case that is worth $10,000 * * * * I want you to get ready and get on it right now, because you have got to do it by noon." Walker says he directed respondent to return home, and assured him that "by the time you get there I think I can have the case and be down there and tell you about it." Walker then went to the home of Wm. Douglas (Sanson's brother-in-law), on Cooper Street in Chillicothe, where he contacted Sanson (who, as we understand, lived in another town). Without setting forth the terms of the solicitation of Sanson by Walker, it is sufficient to say that, as detailed by the witness, it has the ring one would expect in such circumstances, and that their conversation resulted in Sanson consenting to have respondent "call him up, or come down," and (still according to Walker) he then drove to respondent's home, found him waiting on the porch, and told him "everything is O. K. Go on down and get the case."

It is admitted that respondent did go to the Cooper Street address mentioned on the morning in question, saw Sanson and others, and that he did (either then or later) get the case, brought suit, and settled the same (including the Allnutt and Douglas claims) for $8500.00, which was paid by the defendant's insurance carrier. Respondent's contract was for 40% of the recovery, or $3400.00, and Walker claimed he was entitled, under his agreement, to one-half thereof, or $1700.00.

Walker testified that he first learned of the settlement through Sanson, and this was later verified by respondent, to whom he then said, "Well, we had better start cutting up some money, hadn't we?" It appears from Walker's testimony that respondent, then and later, put him off on the pretext that he was too busy, requesting that he return. Finally, on Walker's refusal to be any longer put off, respondent said, "I just don't know what position my bank account is in and I would like to give you a check for $1000.00 and you come back here next week or sometime and we will see if we can get the rest of it straightened out." Walker's reply was, "Your bank account, I can't figure out what you are playing with, my money has anything to do with your bank account. I want my money." In any event, it is conceded that respondent did give Walker a check on that day (December 30, 1944) for $1000.00, and another one for $300.00 (on January 29, 1945), on both of which Walker received the money. Walker was positive that these checks represented partial payments to him for his services in procuring this litigation under his arrangement with respondent; that he finally charged off the additional $400.00 which he contended was due him. It was developed on cross-examination that the witness did not report or include the proceeds of these checks in his income tax return.

Respondent, on direct examination, testified he first learned of the case when Walker called him and told him that Paul Sanson wanted to see him out on Cooper Street. ·He denied he had seen Walker earlier that day, or that he had told him to try to get the case. He says he went to the Douglas home on Cooper Street and saw Sanson, who was worried about some possible criminal responsibility in connection with his wife's death; that "they" wanted him· to sit through the inquest to be held that afternoon and take care of "their" interests in that connection (which he did), but nothing was said about a damage suit [710] at that time, nor was there any "talk or thought of a civil suit at all on that day." (Their written contract was dated July 10, 1944.)

He said the settlement agreement was made the following November, "but the money was not paid until shortly after Christmas," and this because of difficulty in procuring releases from all the occupants of the car, Mrs. Allnutt being in Alabama. He said Mrs. Allnutt got $250.00, and Sanson "about $8200.00," which would mean that Lee Douglas, the boy, received $50.00, but that as to the latter he says no fee was charged.

Respondent's explanation of the $1000.00 and $300.00 checks given to Walker (the larger one of which coincides in date with the release of the money paid in settlement of the Sanson case, and the other shortly thereafter) was that they constituted a down payment on a "land deal" involving 1400 acres of land along Medicine Creek in Livingston County, in which he, Walker and one Bob Staton were to become the purchasers; in other words, that Walker was to pay to the owners, on behalf of respondent, the sum of $1300.00 represented by the checks as a portion of the down payment on the purchase price. According to his testimony, the land was some "that the drainage taxes had taken" and to which D. B. Luther and E. H. Anderson had acquired title of some kind which was held in the names of their wives; that a bankruptcy proceeding against Luther held up and thwarted the original deal, but that he (respondent) finally got back all of his $1300.00, Luther having paid him "along in the spring" $900.00 in cash, and "the other $400.00 was carried along and finally used as part of the purchase price of the land." He says that finally the bankruptcy proceedings were gotten out of the way and Luther and his wife were divorced, and the deal consummated, but with only Staton and respondent "in it" (as purchasers), the title being taken in the name of Staton alone under a quit claim deed dated November 27, 1945, reciting a consideration of $1.00. The purchase price was $5000.00, and the conveyance was made subject to taxes.

On cross-examination respondent admitted that prior to the time he gave Walker the two checks in question, he had had difficulties with him "off and on" for a good many years, but notwithstanding

this he did not take any kind of a writing from Walker pertaining to this $1300.00, nor was there any written contract for the purchase of the land. His explanation of Walker's dropping out of the land deal was "that owing to the delay in time in getting Luther in shape to make the title, why, he [Walker] lost interest in it."

Paul Sanson, while admitting that Walker came out to the Cooper Street address and suggested that he employ respondent, nevertheless insisted that he acted on the advice of his employer, and not Walker's, in entering into the contract with respondent. However, his testimony at one of the previous hearings corroborated Walker in every detail and there was no mention by him at that time of his employer's recommendation. This witness had been previously convicted of a felony.

Robert Staton, in whom title to the 1400 acres was ultimately taken, testified that Walker "was not in on the deal at any time;" that he (Staton) put up all of the purchase money for the land and respondent afterwards paid him for a half interest, and "so far as my knowledge is concerned, I didn't know he [Walker] had anything to do with it because the deal was strictly between Mr. Frith and I."

E. H. Anderson, one of the owners of the 1400 acres of land, testified he never at any time heard Walker mentioned as a party to the deal, but he further added that such deal "was all handled by Luther."

It appears that Luther was not available as a witness. However, an affidavit made by him was introduced in which he stated that in the original deal he had agreed "to sell  *  *  *  to Fred Walker, Bob Frith and others for $6500.00 . *  *  *  and received $1300.00 on the sale sometime about January, 1945, being $1000.00 and $300.00 paid to him by Walker, and to the best of his recollection in cash." In an earlier letter to the Advisory Committee (which is in the record [711] by agreement) Luther stated, "I am sure Walker never gave me a nickel of the money—only Frith."

### COUNT III—The Goins Case—(1941)

This count involves solicitation of a damage claim which went off on demurrer, so there is no question of division of fee involved. A girl, Lucy Goins, was injured when the car in which she was riding went off the highway and struck a telephone pole. Two other passengers (boys) were killed. The accident occurred near Lineville, Iowa. The pattern here is very much like that in the two preceding counts. According to Walker, he learned of the accident from respondent, who told him "it is a $50,000.00 case if you can get it." Walker testified that the people lived at Laredo and that he went there and solicited the case, telling the father and mother of the girl that "we have a lawyer down at Chillicothe that is pretty much

up on this kind of case,'' and suggested that they should try to see him, and he volunteered to be of any help to them by bringing the lawyer to them, or taking them to see him. He testified that he returned to Chillicothe and arranged with respondent for the parents to be at his office at 7 o'clock that night; that this arrangement was carried out, and respondent conferred with them in his (Walker's) presence; that the next day he and respondent took the father of the girl to the hospital at Trenton, where she was a patient, and respondent gave the father a contract and told him to ''go up and get her to sign this.'' The father went up to her room and returned shortly, saying ''she is too sick to sign anything, they won't let me in there,'' to which respondent replied, ''It doesn't make any difference anyhow, she is under age, whether she signs or not.''

Informants introduced as an exhibit a letter from Frith to Walker postmarked at Kansas City, November 9, 1943, reading as follows:

''Dear Fred:

You were not in your place Monday as I came thru. On account of the weather I was in a hurry and did not look you up.

The Myers cases at Trenton are up for argument some week end when Rex Moore & Don Black can be there.

Thot I had better drop you a line to let you know how the matter stood. Will be up the middle of next week so save me a quart.

Robert Frith''

It is conceded that the Goins case was one of the Myers cases referred to in the foregoing letter.

Respondent's version of the matter was that the first he knew of the accident was when Walker brought the people to his office. He denied making the statement ascribed to him by Walker as to the value of the case. He admits that he and Mr. Don Black took the Goins contract, but that they were never able to make a case and, as above stated, it went off on demurrer. In this connection, this excerpt from his direct examination may not be without significance:

''Q When Walker brought this case down there, did he assure you that they could prove agency all right?

A He and Mrs. Weber told me that Grimes was just an employe of Myers.''

With reference to the execution of the Goins contract, respondent testified as follows:

''Q Where did you go to get the contract?

A I gave the contract to the parents of the girl in my office.

Q You didn't see her sign it then?

A I did not.

Q How did you get the contract back?

A  Mr. Walker brought it in.

Q  Fred Walker brought you back the contract?

A  That is right.''

Respondent's explanation of the letter was that he was ''carrying back liquor (''a quart or two'' at a time) to the boys in the [R. F. C., at Kansas City] office because they couldn't buy it in Kansas City at that time;'' that Walker ''was very much interested in the Myers cases,'' but not in a financial way, but through vindictiveness and his dislike of Myers (the defendant), and that was the only reason he was letting [712] him know about the status of the cases mentioned in the letter.

### COUNT IV—The Crutcher Case—(1940)

This appears to be the weakest of the solicitation cases. Rev. James M. Crutcher and his wife were involved in an automobile accident near Hamilton in November, 1940, in which Mrs. Crutcher lost her life and he was injured. Following the accident, he was taken to a hospital at St. Joseph. According to Walker's testimony, respondent requested him to undertake to solicit the case, and that he did so. He detailed his several trips to the hospital at St. Joseph and his visits with Rev. Crutcher while there. In that connection he testified that, with Rev. Crutcher's consent, he took respondent to the hospital for the purpose of interviewing Rev. Crutcher, but on that occasion the latter told them he was not interested. (It appears that in the meantime he had retained other counsel.) Walker further testified that just prior to the trip last above mentioned, he and respondent went to the local minister of Rev. Crutcher's church at Chillicothe and tried to obtain a letter of recommendation to be delivered to Rev. Crutcher, but the local minister refused so to do. Respondent denied that he had ever discussed the case with Walker; denied that he ever sent Walker to Rev. Crutcher; denied he ever went to see Rev. Crutcher himself, and also denied the letter of recommendation incident. Neither side produced the local minister involved therein. The information charges this solicitation to have been made in 1941, but that date is apparently an error, because the certified copy of a petition filed by other counsel for Rev. Crutcher shows the same to have been filed on December 2, 1940, and it alleges that the accident occurred on November 25, 1940. Walker did not undertake to state precisely the year, and so the matter of date becomes unimportant.

### COUNT V—The Walby Divorce Case—(1946)

Count V charges a violation of rule 4.22 in that respondent's conduct before the Circuit Court of Harrison County in the Walby divorce case was not characterized by candor and frankness. There is little, if any, dispute as to the facts, which may be summarized

thus: Respondent was counsel for plaintiff, the wife, in the case of Arvina Walby v. Hubert Walby, in the Circuit Court of Livingston County. The action (an uncontested divorce case) was heard on May 13, 1946, and at the conclusion of plaintiff's evidence the court denied a decree. The evidence showed the parties were residents of Chillicothe. On the next day, May 14, 1946, respondent, as counsel for Mrs. Walby, filed a petition in the Circuit Court of Harrison County praying a divorce from her husband; and on the same day there was filed in the Harrison Circuit Court, in the same cause, an "entry of appearance and answer" of Hubert Walby, the husband. This instrument was signed, not by a lawyer, but by the defendant himself, and acknowledged before respondent as a notary public on May 13, 1946. The case was heard in the Harrison Circuit Court the day on which it was filed, and a decree of divorce was granted to the plaintiff. Respondent admitted that he had refiled the case as alleged and shown by the informants, and further admitted that he did not inform the judge of the Harrison Circuit Court that it had been previously tried in Chillicothe, and decided against his client. His only explanation was that plaintiff was pregnant by another man, and was waiting to marry the father of the unborn child.

COUNT VI—The Allnutt Divorce Case—(1945)

This count charges a violation of rule 4.06 in that, under the facts hereinafter outlined, respondent represented adverse and conflicting interests in the Allnutt divorce case, which had been filed by him as attorney for the husband, Jesse Allnutt, against Naomi Allnutt, in the Circuit Court of Livingston County, Missouri, on May 2, 1945. The wife was represented by Charles S. Greenwood, who filed an answer and cross bill on her behalf. On October 11, 1945, when the case was docketed for hearing, Greenwood, in open court, withdrew as attorney for the defendant for the [713] reason, according to his testimony, that his client had become dissatisfied with his services, and he felt, in view of that fact, he could no longer represent her. It stands admitted, under respondent's own testimony, that when Greenwood withdrew, he (respondent) proceeded to put on defendant's case and procured the divorce for her, which included an award of the custody of the three children.

According to Greenwood's testimony, respondent was present when he announced his withdrawal, and expressed the desire that he stay in the case, but this Greenwood declined to do; whereupon, according to the witness, respondent said to the judge, "Well, I will represent her." The judge commented that "if the Bar Committee hears about this, it will look mighty bad." Respondent then said to the witness, "Well, I have been whipped over the back before; I can take it," and announced that he would represent the wife. The judge inquired if he cared to file any additional pleadings, to which respondent replied, "No, I have prepared an answer, but I will just

let the record stand as it is and proceed on the cross bill." Respondent's explanation of this unusual procedure was that he and Greenwood, before the latter's withdrawal, had an understanding that the divorce would be granted to the wife and the custody of the children awarded to her, so as to permit a portion of the husband's disability payments from the Veterans' Administration to go to his dependents. He says that he called his client and explained the circumstances and "told him that the only way I knew would be that I could put her on the stand and question her." The husband's testimony purports to lend support to this proposition, but his testimony, as a whole, is very unsatisfactory. It is quite obvious that he was anxious to be divorced and it would not have made the slightest difference, so far as he was concerned, as to whatever maneuvering may have been thought necessary.

### COUNT VII—The Wheeler Divorce Case—(1945)

This count grows out of a property settlement entered into between the parties to a divorce case which it is alleged was negotiated by respondent in violation of rule 4.09, which interdicts negotiations by a lawyer with an opposite party who is represented by counsel, except through such counsel.

Here again the issue is one of fact. The Wheeler divorce case was pending in the Livingston Circuit Court. Respondent represented plaintiff, the husband. Charles S. Greenwood, representing the defendant wife, had filed an answer and cross bill in her behalf, as well as a motion for temporary alimony and suit money. Mr. Greenwood testified that his first knowledge of any settlement was in January, 1945, the day on which the wife's motion for temporary alimony was docketed for hearing. He testified that on that day respondent called him over the phone and said, "The Wheelers are in my office and Mrs. Wheeler has signed an agreement in that divorce matter." After an exchange of views as to the ethics involved in such a course of action, the witness observed that it looked like it had put him out of the case, and he demanded that he be paid for the services he had rendered. He says respondent agreed to come right over to his office, and he did so within two or three minutes, accompanied by Mr. and Mrs. Wheeler; that he spoke to Mrs. Wheeler first and asked her, "Is it true that you have signed an agreement in this divorce matter?" and that she replied, "Yes." He inquired of Mrs. Wheeler if it was all right for her to go ahead with the divorce without his services as a lawyer, and that she "looked at Mr. Frith and her husband and says, 'I guess so.' " Whereupon, he informed Mr. Wheeler that the amount of his fee would be $50.00, to which the latter objected, but respondent said that it was all right—"Go ahead and pay him," and that Wheeler "counted out $50.00 in currency and threw it down on the desk in front of him, and they left the office." The

record shows that on January 23, 1945, the divorce was awarded to the husband, the record further showing the withdrawal of the wife's answer and cross bill and of Greenwood as her counsel.

[714] Respondent testified that after he filed the divorce suit the parties came to his office and stated that they wanted to draw up a property settlement, and that he called Mr. Greenwood immediately and asked him to come over; that Greenwood refused to do so, saying that if they had agreed on a property settlement, there wasn't any need of his coming over; that "what he wanted was to pay him and let him go;" that he advised Mr. Wheeler he would have to pay Greenwood a reasonable fee. Respondent further testified that he did not remember whether he went over to Greenwood's office with the Wheelers, but his recollection was that he did not, but he would not say positively; that his only purpose in calling Greenwood was to tell him the people were there in regard to a property settlement, and that he wanted him to come over so that it could be worked out; that he actually drew up the contract, but that it was never submitted to Mr. Greenwood because he (Greenwood) foreclosed that.

Respondent called Wheeler, the husband, who testified: "I went to Mr. Frith's office and told him we had reached an agreement and would like to have some papers drawn up to that effect. So he said 'Well, I will call Charley and have him come over.' I heard him call and he said 'Mr. and Mrs. Wheeler is in my office and they have agreed to make a settlement', and he asked him to come over and we would draw up an agreement on paper. And it seems as though that he wasn't willing to come from the sound of the conversation. I paid Greenwood his fee of $50.00. The contract was drawn up by Frith, but after Greenwood was called over phone. It was signed in Frith's office." The wife did not testify.

### COUNT VIII—The Wetzel Case—(1940-41)

This count represents another solicitation charge. It grows out of an automobile accident in which Harley Wetzel was injured. Theodore L. Kesler, a former justice of the peace and office associate of respondent, testified that the latter came to him and asked if he knew Wetzel, and after being told that he did, respondent "told me to go out and see if I could get the case;" that the witness did so—"I got the case one evening, and the next evening he and I went out and he signed up the papers;" the suit was pending three or four years and "finally he [respondent] told me that the case was settled * * * he paid me $25.00 * * * He said the case had been settled out of court and they didn't get a good settlement, but it was good enough, and I told him I thought that was good enough for the trip out there. * * * He promised to pay me if I would go out there and get the case, and did pay me." This was the only case in which respondent paid him money for any solicitation.

Wetzel testified that on the evening of the accident he was taken to a Chillicothe hospital; that his neighbor, Elton Jones, took him home from the hospital that night after he had had his injuries dressed; that the next morning (which was Sunday) Elton Jones brought him back to town, and at that time he requested Jones to take him up to respondent's office; that they drove up in front of respondent's office and parked, and that respondent talked to him that morning; that he did not really employ respondent that day, that is, did not sign a contract with him, until a few days later.

In reference to Kesler's connection with the case, the witness was asked this single question, and he made the following answer:

"Q  Do you have any knowledge whatsoever about Mr. Kesler having interviewed you, or having any interest in this lawsuit, or seeing you at any time about it?

A  I don't remember of him having anything to do with it."

On cross-examination he admitted he had known Kesler for more than twenty years, and had been friendly with him during that time. These questions and answers touching Kesler's connection with the case appear in his cross-examination:

"Q  And you are not telling the Court positively that he didn't see you and talk with you about your accident, are you?

A  I don't remember of him seeing me and talking to me about it.

Q  You are not saying positively that he didn't talk with you?

A  No.

\*  \*  \*  \*  \*  \*  \*

[715] Q  You are not telling the Court positively that Mr. Kesler wasn't out there sometime after you were hurt before you saw Mr. Frith, are you?

A  I don't remember of it at all.

·Q  I say you are not saying positively that he wasn't there?

A  No.

\*  \*  \*  \*  \*  \*  \*

Q  Do you recall now, Mr. Wetzel, whether Mr. Kesler ever talked to you about your injuries?

A  No, I don't recall that he did.

Q  You don't recall he did, but you wouldn't say he didn't?

A  No."

Wetzel's neighbor, Jones, testifying on the part of respondent, said that the next morning after the accident he took the injured man to Chillicothe to see a doctor, and that Wetzel said at that time that he wanted "to go up and see Bob [Frith] and see what we can do about this. I think there ought to be something done about it." He further testified that either that morning or the next he took Wetzel "up in front of Frith's office," and respondent conferred with him

in the car parked in front of the drug store over which respondent officed.

Kesler's wife was called as a witness in rebuttal, and she testified she accompanied her husband to Wetzel's home on the occasion mentioned in her husband's testimony, and that she was present in the bedroom when her husband told Wetzel the nature of his mission in respondent's behalf. She related the conversation in which her husband solicited the case.

The respondent denied that he had sent Kesler to contact Wetzel, and stated that the first he heard of the accident was when he talked to Wetzel in the car in front of his office. He admitted paying Kesler $25.00, but insisted that it was for services in locating witnesses and in stopping witnesses after the case had been settled the night before the trial was to commence.

## COUNT IX—The Baker Divorce Case—(1947)

Respondent represented Annabelle Baker in her suit for divorce against her husband, Milford, in the Circuit Court of Livingston County. The case, uncontested, was heard December 15, 1947, resulting in the denial of a decree. Immediately thereafter, respondent drew up another divorce petition between the same parties, and on the same grounds, acting as notary in administering the statutory oath of plaintiff to the petition (which bears date December 15, 1945); and on the 19th day of December, 1947, he filed the same in the Circuit Court of Carroll County, and procured an order appointing a next friend to act for the minor plaintiff. On July 22, 1948, acting as her attorney, he appeared in the Carroll Circuit Court and presented the case, and obtained a decree of divorce. There was no contest. It is admitted that, as in the Walby case, respondent did not disclose to the judge of the Carroll Circuit Court the fact that the case had previously been heard in the Livingston Circuit Court, and a decree denied.

Respondent's justification for the refiling of the case in Carroll County was that he discovered that plaintiff, a minor, was living with her father, who resided across the county line in Carroll County. As to when he made this discovery, he testified as follows:

"Q Well, afterwards [i. e., after the denial of the decree] and shortly afterwards, you drew an amended petition because she had gone back and you found that she was living in another county?

A We drew another petition and I found out then that they were living at Boswell, in Carroll County."

Annabelle's father, testifying for respondent, said that after the separation, the daughter went to Chillicothe to live and to work, and that she was working there when the first suit was filed, but later, and before it was tried, she returned to the home of her parents, which was in Carroll County about two miles south of the Livingston county line.

COUNT X—The Anderson Divorce Cases—(1948-49)

It is admitted that on September 30, 1948, respondent brought a suit for divorce for Evelyn Anderson, as plaintiff, against her [716] husband, Lloyd Anderson, as defendant, bearing No. 35857, in the Circuit Court of Livingston County. Thereafter, while that cause was still pending and undisposed of, he filed a petition for divorce as attorney for Lloyd Anderson, as plaintiff, against Evelyn Anderson, as defendant, numbered 35914, in the same court. The statutory affidavit appended to each petition shows that respondent acted as the notary before whom such oaths were taken. Respondent testified that after the first suit was filed, Evelyn's mother came to him and told him that the parties had gone back together and for him to dismiss the case, but that he overlooked it, although he thought he had dismissed it. Some three or four months later, the husband came in and he filed the second suit for him. That case was never tried, but was dismissed after one of the hearings in the instant proceeding. The following excerpts from the cross-examination of respondent seem to fairly summarize his version of the matter:

"A  I thought I had dismissed it, and when the court called my attention to the fact that there were two cases there, I told him I would get my file and check it. One of them was supposed to have been dismissed.  *  *  *

Q  Actually, what happened was, wasn't it, that the court called your attention to the fact that you had two cases pending, divorce cases, involving the same parties, in which you represented one party in one case and the other party in the other?

A  Actually that is right, Mr. Carson."

Evelyn's mother, testifying on behalf of the respondent, said that at the request of her daughter, she went to respondent's office and "told him they had went back together and she wanted the divorce withdrew." Evelyn testified that she told her mother "to go up and drop it."

CONCLUSIONS

The special commissioner, in reaching his conclusions as to the guilt of respondent, found that the charging facts as to each count of the information were true, and also found all of the material and controversial facts at issue as to each count in favor of informants and against respondent.

Fred Walker operates a retail liquor store at Chillicothe. He has been engaged in that business since 1942. Respondent called three apparently disinterested witnesses—a former sheriff, a former county judge, and the owner of an auto parts business—each of whom testified that Walker's reputation for truth and veracity was bad. There can be no doubt of his hostility toward respondent. He admitted as much, and it is otherwise apparent from a reading of the record. He frankly admitted he made no complaint touching the matters here

involved until after respondent, as prosecuting attorney, in 1947 or 1948, had filed a criminal charge against him—that of selling liquor to a minor, a misdemeanor. Even though Walker may not have been actuated by worthy motives in voluntarily making his disclosures to the Advisory Committee, that fact would not entitle respondent to an acquittal. Its effect should be, and has been, to cause his testimony to be scrutinized most carefully, and to alert the court in seeing to it that no injustice is done, and that its disciplinary powers are not improperly exercised.

Particular exception seems to have been taken to that portion of the special commissioner's report in which he pointed out that the only witness who testified touching respondent's reputation (and that for being a law-abiding citizen) was the former sheriff, who also testified to Walker's bad reputation for truth and veracity; that the other two witnesses as to Walker's character were not asked concerning respondent's own reputation, nor was the cashier of the Citizens Bank at Chillicothe (of which respondent was a customer), who was on the stand for another purpose. (The hearing was held at Brookfield, not Chillicothe.) The special commissioner properly concluded such testimony would have been admissible had it been offered. Respondent takes the position he is entitled to the presumption that he enjoys a good reputation because of the failure of the informants to impeach his reputation after [717] he had opened the matter by the inquiry to the single witness mentioned. This savors too much of the practice in criminal and adversary cases. An attorney under accusation in a disciplinary proceeding is not obliged to offer proof on the subject, nevertheless it is almost universally recognized that a good reputation strongly tends to prove innocence. In our own jurisdiction it has been said that "many times it is difficult to arrive at the truth or falsity of such [unethical conduct] charges. They can be easily made by unscrupulous persons; and evidence in support thereof, many times, is not easily rebutted, except by evidence of the good moral character of the attorney charged. In such cases evidence of good character, coming from recognized leaders in the profession and in the civic life of the community in which the accused resides, is entitled to great weight." In re Mason, (Mo. App.) 203 S. W. 2d 750, 769.

The special commissioner saw the witnesses and his opportunity for determining their credibility was far superior to that afforded us by the cold record. We find ample support in the record for the view that respondent's denials and his exculpatory testimony are outweighed by other facts and circumstances, including his own admissions. Accordingly, all of the sitting members of the court are in accord with the special commissioner's conclusions on the issue of guilt, but the matter of punishment has given us some concern. There is some feeling that it should be greater than that recommended;

114

however, the writer is willing to defer to, and follow the recommendation on that subject because of the understanding, judgment and experience of the able circuit judge who made it. An enforced three-year interruption in respondent's professional career at this stage in his life, while falling short of permanent disbarment, will, we feel, under the circumstances here involved, serve the purpose at the bottom of all disciplinary proceedings, i. e., not punishment, but the protection of the public and the courts. It is, therefore, ordered that respondent be suspended from the practice for a period of three years from the effective date of the judgment herein. All concur, except *Ellison, J.*, not sitting.