IN RE PAUL GITTERMAN, No. 43134—264 S. W. (2d) 366.

Court en Banc, January 11, 1954.

Rehearing Denied, February 8, 1954.

*George L. Gisler* and *William H. Sanders* for informants.

*Maurice J. O'Sullivan* and *John G. Killiger, Jr.,* for respondent.

LEEDY, J.—This is a proceeding in the original jurisdiction of this court, instituted by the Advisory Committee (authorized and designated under S. Ct. rule 5.18 as the legal representative of the Bar of this state) to disbar Paul Gitterman, an attorney practicing in Kansas City. It was instituted March 17, 1952, by the filing of an information in four counts charging professional misconduct and unlawful conduct on his part in various particulars. On motion, Hon. Edward J. McCullen, long-time Judge of the St. Louis Court of Appeals (now retired), was appointed Special Commissioner to take the testimony and report his findings of fact and conclusions of law. In an exhaustive report which accompanied the 664-page transcript of the testimony taken before him, the Special Commissioner found the

charges contained in counts II, III and IV had been sustained by the overwhelming preponderance of the evidence (count I had been voluntarily dismissed before the hearing commenced), and he recommended disbarment.

On the present submission respondent opposes the findings and recommendation under "Points and Authorities," which we quote in full:

"I.

Informants Wholly Failed to Prove Allegations of Count II.

II.

There Was No Proof of the Charges of Count III of the Information.

III.

There Was No Showing of Improper Conduct As Charged in Count IV of the Information.

IV.

Conclusion.

In re Williams, 128 S.W. 2d 1098, l.c. 1108, 233 Mo. App. 1174.
In re Titus, 225 S.W. 2d 715, 359 Mo. 1070.
In re Frith, 233 S.W. 2d 707, 361 Mo. 98.''

Respondent, now in his late thirties (and a man of family), was admitted to the Missouri ▮▮▮▮ Bar in 1941. He has practiced in Kansas City continuously since that time except for a period during the war when he did legal work for the United States Army Engineers office in that city. Leaving the latter connection in 1943, he was successively an associate of the firm of Thompson and Osborne; member of Osborne, Keim, Ponick and Gitterman; associate of Ira Witschner. Limitations of space make it impossible for this opinion to develop the facts with the same minuteness and detail as in the report just mentioned. With this in mind, we outline the general facts having to do with each of the three counts remaining after the dismissal of count I.

Count II: This charged Gitterman with having hired and retained one Nick Callowick as a snitch or runner "to solicit and attempt to procure the claims and lawsuits of various persons involved in accidents," and paying him various sums of money for such services "and promising to pay him a certain percentage of his attorney's fee in all cases obtained by accused as a result of said solicitation."

Callowick, 46 years of age, a layman (of Yugoslav parentage), an ex-professional wrestler, had also formerly been engaged in labor union work, and was later with the War Production Board. He testified that he first became acquainted with Gitterman in 1948 in the office of Duke Ponick, who was officing in the same suite with Al Osborne and Gitterman; that he more or less drifted into a companionship with him while "hanging around" the Al Osborne office and

finally started "doing odd jobs for Paul [Gitterman] in connection with his law business * * *. Then he would have me talk to other people in regard to law cases * * *. Cases that people who had been involved in an accident or something of that nature, who needed an attorney, I would go out and talk to those people for him * · * *. I would go out to those people and explain to them that they had been hurt and they had certain rights and those rights should be protected and in order to protect their rights it was necessary for them to have an attorney that was qualified to handle the matter for them, and then I would suggest to them that they employ the firm of Witschner and Gitterman, that they were, in my opinion, the most able people, and talk them into signing up a contract with them.

"Q Who suggested to you, if anyone did, that you go out and approach people along those lines? A Mr. Gitterman and Mr. Witschner."

The witness testified that respondent furnished him with two types of printed contract forms, as well as business cards, one containing the name of Paul Gitterman and the other Ira K. Witschner and Paul Gitterman; that he accompanied the respondent several times when the latter picked up police reports from police officers, which reports furnished some of the leads used in soliciting cases. Other leads came from the two lawyers themselves as well as from newspaper items and reports of the coroner. He further testified that for about fourteen or fifteen months he worked full time for, and under the direction of, the respondent as a snitch; that he was paid for his services during that time "in the neighborhood of $300," and that he was to receive a third of the attorney fee. Asked "Why were you working for these lawyers for a year and a half if that is all you got out of it?" the witness explained that he was lured on with assurances that several good cases which he had solicited were coming up for trial which would make him wealthy—"(there was one case) in particular that I recall, it was a railroad case, and they (Gitterman and Witschner) talked to me about a thing called federal liability and said the possibilities were unlimited on that and I might get $20,000 for my share."

The witness particularly identified as among the cases he solicited or sought to solicit on behalf of respondent those of Isey Howard, James Neal and Mae Twist.

Isey was a colored woman, 76 years of age, illiterate and infirm. She had been struck by an automobile while crossing the street near her home. She testified that upon returning home from the hospital (where she was detained only a short while), Callowick called on her, and said the police had sent him to look after her. "He ▮▮▮ said he went to the hospital and they told him where to find me, and he taken the case." Her intimate friend, Sceless Crosslin, who lived in the same apartment building, testified that when Callowick (whom she described as a big man) came to Isey's apartment "he had her sign a

card * * *. She couldn't write but she touched the pen. * * * He told her that he could get her a good lawyer and she could get something out of it. She said 'I need a doctor, I am hurt.' He said, 'I will get you a good lawyer and see that you get something out of it, and I will see that you get a doctor.' "

Isey testified that Callowick took her to respondent's office where she met respondent for the first time. Sceless Crosslin testified that on other occasions she accompanied Isey to respondent's office.

Mrs. James Neal, testifying by deposition, stated that subsequent to the time her husband was struck by a motor car at 12th and Broadway, Callowick ("a great big man") came to the home, represented that he was acting for Gitterman, and attempted to solicit the case for him. He gave Mrs. Neal one of Gitterman's professional cards which was produced and offered in evidence, and on the back of it she had at the time made the notation, "Nick Calloway, investigator." Neither Callowick nor Gitterman were known to the Neals, and as the latter were not interested in employing a lawyer, nothing came of Callowick's overtures.

Mrs. Mae Twist, also testifying by deposition, stated that she had been struck by a car while crossing the intersection of 12th and Walnut Streets, was taken to General Hospital and released in a couple of hours, and returned home on the streetcar. After she had been home a while, Callowick (a total stranger) called and presented Gitterman's professional card, a name likewise unknown to her. He solicited the case for Witschner as well as Gitterman, and was successful in having her sign a contract employing Ira K. Witschner and Paul Gitterman as her attorneys (which was in the form of a printed card). The case was settled, and she received the sum of $200 as her share. All of her negotiations with respect to the case were conducted by telephone, so that she did not actually see either Witschner or respondent.

Mamie Brown, a colored woman whose husband had been killed in the collapse of a scaffold on a painting job on which he was engaged at Kansas City, testified that her first knowledge of his death came to her when Paul Gitterman and another man, whom she described as being large and heavy set, called at her home, and that the other gentleman (not Gitterman) notified her of her husband's death. She inquired as to the whereabouts of the body, and when told by the same man that it was at Sterling Bill's Funeral Home, she protested that she wanted it removed to the Watson's Undertaking Parlor. At that juncture Gitterman told her, "Sign this paper," which she did, thinking she "had to sign for my husband's body to be moved." This paper proved to be a contract employing Gitterman to represent her in the matter of her husband's death. He later negotiated a settlement of her claim for $180, out of which was deducted an attorney fee of $60. She testified that Gitterman told her that he would receive $30

and the remaining $30 of the fee would go to the other man—"the one that told me about my husband being dead."

Callowick had been indicted for perjury in connection with testimony he had given on behalf of Al Osborne. He pleaded guilty to the charge, was sentenced to five years' imprisonment in the penitentiary, and was under parole at the time he testified in this case. On cross-examination, the witness admitted that from time to time he had been known by and used other names, and that he had made several claims for minor damages against various Kansas City firms.

Respondent denied the solicitation of Isey Howard's case, and stated he did not represent her except that, purely as an accommodation to his associate, Witschner, he appeared on her behalf at the taking of her deposition. He denied ever having any contact with Mrs. Twist or Mrs. Neal; had never represented them, nor seen or talked with them. As to the Mamie Brown matter, respondent contends it was not solicited by [369] Callowick, but on the contrary the facts were these: That at the request of a client of the office, who was working with Brown at the time Brown was killed, he went to the Brown home on the morning of the casualty in company with the client (one George Stanberry), and that in the course of Stanberry's conversation with the widow, it was suggested that he, Gitterman, was a lawyer, and might be able to help her; that the upshot of the whole matter was that, at her request, he agreed to and did represent her, finally settling the claim for $150. Stanberry was not called.

Respondent stated that he became acquainted with Callowick in 1948; that Callowick more or less loitered around the office during the pendency of some marital troubles; that Callowick's explanation for not working was that he didn't want to accumulate any funds so that he would have to support his wife and children. He admitted that from time to time Callowick did do some investigation work for him, and attempted to collect some delinquent attorney fees due him. Respondent insisted that this work was done on a voluntary basis, and that no money was paid for such services, although he did on three or four occasions lend small sums of money to Callowick, and did otherwise befriend and feed him. He denied he ever gave Callowick any cards or employment contracts, and never authorized Callowick to solicit business. Such cards were in an open cabinet, and it is suggested it would have been easy for Callowick to have obtained them.

Count III: This count charged that during 1949 and 1950 an arrangement existed between respondent and two officers of the Kansas City Police Department, Evans and Baker, to furnish respondent with reports of accidents occurring in Kansas City, and that respondent paid such officers "for information so furnished and from which information the accused had paid runners and solicitors to solicit and attempt to procure claims and lawsuits."

Reference was made in Callowick's testimony in relation to count II that police reports were used in obtaining leads. Such reports showed the time and place of the accident, the persons involved, injury sustained, addresses, etc. Callowick testified the reports were obtained every twenty-four hours from police officers Baker and Evans, who were to get $50 for each case contracted or signed up, as he was told by respondent; sometimes when he would meet respondent in the morning, respondent would have the police reports with him, but at other times they would park their car at a certain place and remain in it and pick up the reports from the police officers as the latter went by in the police car; that on such occasions the police officers would hand the envelope out of the car window and drive on.

When the Chief of Police learned of this arrangement, he suspended the officers and asked Gitterman for an explanation. He testified that Gitterman admitted to him that he had been getting police reports from four police officers and named them, including Baker and Evans. The delivery of reports by police officers to lawyers in the manner hereinabove described was shown to be a clear violation of the Police Department's rules. The witness further testified that Gitterman inquired of him if the police officers he had named, who were then under suspension, would be permitted to resign rather than stand trial before the board.

Lt. Lucas of the Police Department testified that in his investigation of the purported bribing of police officers in connection with the giving out of police reports, he talked a number of times with respondent; that he was told by the respondent on every occasion that the police officers mentioned would resign from the Police Department if they were assured they would not be filed on by the prosecutor; that if that were the situation, "that the men were not to be filed on by the prosecutor or by the state, he would see to it that the men would resign, and that he would come to the Chief's office and tell us who the officers were in this obtaining of these police reports." The witness further testified that later Gitterman did come to the office of the Chief of Police and, in the presence of the witness, told the Chief the identity of the police officers involved.

 Respondent denied ever being furnished any accident reports by Baker and Evans, or ever paying for such reports. He testified that he occasionally obtained an accident report at Police headquarters on a case or cases where he or his office associates had been employed, and that this was normal procedure in the department. He further testified that he heard rumors that Callowick had told the grand jury that he, Gitterman, was involved with the police officers in obtaining police reports, and then he contacted those officers personally, then passed on to Lt. Lucas the information the police officers had given him, i. e., that they were willing to resign from the police force. He denied any other connection with the matter.

Count IV charges unethical conduct on respondent's part in agreeing to permit and arranging for third persons (persons whose interests were adverse to and in violent conflict with those of a prospective client, one Ernest M. Baldwin) to secretly overhear and tape record an interview or consultation between Gitterman and Baldwin, which consultation had by previous arrangement been scheduled for Sunday morning, November 18, 1951. Respondent's answer to this count alleged that such charge was not properly a matter to be heard for the reason respondent at no time represented Baldwin as an attorney, but on the present submission he defends his action on other grounds.

It is unnecessary to go extensively into the ramifications of the situation, because the controlling facts stand admitted. Baldwin had been Osborne's client, and he and members of his family had recovered judgments, or settlements had been effected, aggregating more than $50,000 for personal injuries, but in the division of those proceeds the Baldwins received but little more than $4,000, and felt they had been unfairly treated. On November 9, 1951, Osborne was indicted in twelve indictments, one for murder and the others for subornation of perjury. Other indictments for subornation of perjury were returned against certain of Osborne's associates, notably, Robert B. Sympson (a lawyer), Winston E. Keim (likewise a lawyer and a former partner of both Osborne and Gitterman), and Raymond J. Mc-Guire, Osborne's lay investigator. The name of Ernest Baldwin was endorsed on two of these indictments as a state's witness. In addition, Baldwin was to be an important witness against Osborne in Osborne's disbarment case, then set for November 19.

In the previous September, one Alex Pack had brought his friend Baldwin up to Gitterman's office to discuss Baldwin's claim against Osborne, and after hearing Baldwin's story, Gitterman advised him the matter "would certainly bear looking into." Baldwin did not employ Gitterman at that time, but said he would be back. Pack visited Gitterman's office later and told him that Baldwin wanted to get something done on his claim against Osborne, and Gitterman told Pack to "tell them to come in and see me." Again on Saturday, November 17, Pack visited Gitterman and repeated what had been said at the meeting last above noted. Pack suggested that same Saturday afternoon as the time for such a meeting, but this did not suit Gitterman, who told Pack to tell the Baldwins to come in about 10:30 the next (Sunday) morning. Later in the afternoon Gitterman met Keim and McGuire and talked in McGuire's car about the prospective visit of Baldwin to Gitterman's office the next morning. During the course of their conversation, McGuire urged Gitterman to permit Keim and McGuire to listen in the next morning on Baldwin's conversation. Much evidence was introduced to show that McGuire and Keim undertook on behalf of themselves and Osborne and Sympson to get Baldwin

to agree to accept $11,000 for Baldwin and his father-in-law to go to California, and stay out of the jurisdiction of Missouri courts until after the charges against Osborne, Keim, Sympson and McGuire blew over . However, the Special Commissioner concluded the evidence was insufficient to connect Gitterman with the efforts of the persons just mentioned, and we do not review that ruling because of the result which we think the evidence compels. The fact remains, and it is admitted by respondent that while at first he objected to such procedure, he nevertheless ▮▮▮▮ agreed to go through with the plan of permitting Keim and McGuire to listen in by secret use of a tape recording device over the intercommunicating system in his own office. Moreover, in an affidavit he made, he stated that he met Osborne on the Sunday morning that he was supposed to meet Baldwin, and told Osborne ''The Baldwins were coming to my office that morning to see me about suing him. * * * I told him I had made a mistake to let McGuire and Keim hear what they [the Baldwins] had to say in my office. However, he overcame my scruples about this * * * Osborne then told me to go on down there [to my office to see the Baldwins], and see what they had to say. He offered to pay me for my services. He told me he would take care of me for my trouble. * * * My intention at this time was to talk with the Baldwins to learn their side of the story. * * * There was no intention on my part at that time to file any suits or make any claims on behalf of the Baldwins against Osborne in connection with the Baldwin damage suits which Osborne had handled. The whole point was to get the Baldwins into the office so Keim and McGuire could overhear what they had to say.'' At the hearing, respondent repudiated some of the statements made in the affidavit. For example, he testified in reference to Osborne compensating him, he meant Osborne would ''take care of Callowick (whom he suspected of making threats to his family over the phone) for him; that Osborne told him on the Sunday morning in question, ''I can take care of Nick if he is calling up bothering your family and making threats and so on. Don't you worry about it. I will take care of that.'' In that same connection, he further testified:

''Q How did you expect him to take care of Callowick?

A Well, I thought perhaps his method would be of submitting to some of Callowick's demands. That would probably have quieted Callowick down. I know I wouldn't have had this trouble if I had given him $3,000.

Q What demand of Callowick's do you think he was to—

A Money.

Q You thought he would buy off Callowick? A Yes, sir.

Q In return for your letting Osborne's men eavesdrop on Baldwin?

A Not in return. He had to buy him off for his own protection because Callowick in confessing perjury got Osborne into another—

Q (Interrupting) How did you at that time, as a lawyer familiar with the canons of ethics, feel about Osborne buying off a witness, namely, Nick Callowick?

A I don't know whether Nick Callowick was a witness.

Q All right, buying off a man then?

A Well, that is a practice that he follows and my feelings about what he does would be immaterial, I believe."

Respondent at the trial reaffirmed his statement in the affidavit with respect to having told Osborne he had made a mistake in agreeing to let McGuire and Keim eavesdrop. Asked what he meant by mistake, respondent answered, "Well, I still had some misgivings—I will use that descriptive term—about letting them come into my office while I am talking to somebody. I mean they had no actual connection there." His examination proceeded thus:

"Q You have testified here today that you are familiar with the canons of ethics of the Bar? A Yes.

Q I take it your misgivings were in connection with the canons of ethics? A Yes.

Q Then you say that after you indicated to Osborne that you had some misgivings about this eavesdropping because of the canons of ethics, Osborne overcame your scruples about this? I believe that is the language of your affidavit.

A Yes, sir, I used that language.

Q Your scruples were the canons of ethics? A Yes.

Q How did he overcome them?

A Well, in this respect, in that I was informed that actually there would be no violation of any of the canons of ethics.

Q Who informed you there would be no violation?

A Osborne in his conversation said 'Why, you are not an attorney and client relationship. They are just going to come in and talk to you' so I felt I was going to be a sort of a mediator rather than anything else, that I was going to see maybe I could work the proposition out, and Osborne said that he had so many suits against him, I would have to get in line." ·

On the Sunday morning in question, Keim, McGuire and a court reporter appeared, and installed the apparatus for overhearing and recording the scheduled interview. Gitterman was present, and all was in readiness for the expected arrival of Baldwin. The interview did not take place as scheduled because Baldwin sent word by Pack that he would not be there that morning.

Respondent's position with respect to this charge is thus summarized in his brief: "The basic facts of the situation are that the accused did permit these persons to come to his office at a time when a possible prospective client was coming in to confer with the accused. Under the circumstances of the making of this decision, however, this conduct was certainly not such as to warrant Gitterman's loss of his right to

practice his profession. His conduct at most showed bad judgment in a difficult situation and it was not a criminal or malicious act. The accused evidently attempted to act as a peace maker, and as a result, suffered the fate which too often comes to peace makers." We do not believe the matter may be so lightly treated. On the contrary, we agree with the Special Commissioner that although Baldwin was not yet actually and fully respondent's client, respondent had led Baldwin to believe he would look into his claim against Osborne; that this was a relation of trust and confidence upon which Baldwin had a right to rely; but that under respondent's own admissions, it was one he agreed and arranged to betray. The fact that the conference did not take place does not relieve respondent of his culpability in such an ignoble and unworthy undertaking.

The Special Commissioner found that the three charges had been sustained by the overwhelming preponderance of the evidence. Enough of the record has been set forth to demonstrate the correctness of his conclusion, in which we fully concur, and we adopt his report and recommendation. Judgment of disbarment is, therefore, ordered. All concur.